2014 UT App 138

**D.A. and S.A., Petitioners and Appellants,**

v.

**D.H., Respondent and Appellee.**

No. 20120756–CA.

Court of Appeals of Utah.

June 19, 2014.

Dahls' motion to set aside the judgment without holding the requested hearing.

Daniel R. Cragun, J. Jarom Bishop, Ryan J. Stanger, and Colby B. Vogt, for Appellants.

Steven C. Russell, for Appellee.

Judge JOHN A. PEARCE authored this Opinion, in which Judges STEPHEN L. ROTH and MICHELE M. CHRISTIANSEN concurred.

## Opinion

PEARCE, Judge:

¶ 1 The appellants sought custody of their infant grandchild after their daughter, the infant's mother, passed away. Under Utah's Custody and Visitation for Persons Other than Parents Act, the grandparents needed to rebut the presumption that the father of the infant had the fundamental right and duty to exercise primary control over the care, supervision, upbringing, and education of his child. The Act allows that presumption to be rebutted by clear and convincing evidence of several factors. One of the statutory criteria can be satisfied with evidence that "the parent is absent." The grandparents argued below that they could rebut the presumption because their deceased daughter was "the parent [who] is absent." The father contended that the Act required evidence that he, the parent whose decisions the presumption protected, was absent. The juvenile court agreed with the father and ruled against the grandparents. The grandparents appeal that decision, and we affirm.

## BACKGROUND

¶ 2 Child is the infant daughter of an unmarried couple: Mother and Father. For at least a year after Child's birth, Father was unaware of his paternity because Mother initially maintained that another man was Child's biological father. After learning of his paternity, Father began to establish a relationship with Child. Mother predominantly resided with her parents (Grandparents) until her death, two years and three months after Child was born. After Mother died, Child remained in Grandparents' care for seventeen additional days. Father then took Child to live with him.

¶ 3 Two weeks later, Grandparents filed suit against Father. The district court granted custody of Child to Father and granted visitation rights to Grandparents. Grandparents then filed a petition for custody in the juvenile court, pursuant to the Custody and Visitation for Persons Other than Parents Act. *See generally* Utah Code Ann. §§ 30–5a–101 to –104 (LexisNexis 2013). At the hearing on that petition, a court-appointed custody evaluator testified that Grandparents had provided Child with "a very stable, structured environment" and that they had helped Child develop into a "smart, loving little compassionate girl that has a pretty solid developmental state." The evaluator also testified that although Father's work took him to Idaho and California for significant periods of time, Father was not an absent parent and had a good relationship with Child.

¶ 4 The juvenile court determined that the Act required Grandparents to show that Father was an absent, neglectful, or abusive parent. It found that Grandparents had not carried that burden and therefore could not rebut the statutory presumption that Father's decisions were in Child's best interests. Accordingly, the juvenile court dismissed Grandparents' petition. Grandparents appeal that dismissal.

## ISSUE AND STANDARD OF REVIEW

¶ 5 Grandparents contend that the juvenile court erred in its interpretation of the Custody and Visitation for Persons Other than Parents Act. Specifically, they assert that the Act's language is ambiguous and that their reading is supported by legislative history

and policy considerations.[1] We review a juvenile court's interpretation of a statute for correctness, and we review any underlying factual findings for clear error. *In re M.E.P.*, 2005 UT App 227, ¶ 8, 114 P.3d 596. "Only when we find ambiguity in the statute's plain language need we seek guidance from the legislative history and relevant policy considerations." *World Peace Movement of America v. Newspaper Agency Corp.*, 879 P.2d 253, 259 (Utah 1994).

## ANALYSIS

¶ 6 Grandparents contend that the statutory language is "ambiguous as written because there are two or more plausible meanings of the statute." "[W]hen interpreting statutes, our primary goal is to evince the true intent and purpose of the Legislature." *State v. Maestas*, 2002 UT 123, ¶ 52, 63 P.3d 621 (citation and internal quotation marks omitted). "The plain language of the statute provides us with the road map to the statute's meaning, helping to clarify the intent and purpose behind its enactment." *Id.* We read statutory language so as to render all parts of the statute relevant and meaningful, and we presume the legislature used each term within a statute advisedly and according to its ordinary meaning. *Id.* Each part of a statute "should be construed in connection with every other part . . . so as to produce a harmonious whole." *Id.* ¶ 54 (citation and internal quotation marks omitted).

¶ 7 We therefore look first to the statute's plain language. The Act declares that "it is the public policy of this state that parents retain the fundamental right and duty to exercise primary control over the care, supervision, upbringing, and education of their children." Utah Code Ann. § 30-5a-103(1) (LexisNexis 2013). Accordingly, "[t]here is a rebuttable presumption that a parent's decisions are in the child's best interests." *Id.* The Act then provides the mechanism for a "person other than a parent" to rebut that presumption:

> (2) A court may find the presumption . . . rebutted and grant custodial or visitation rights to a person other than a parent who, by clear and convincing evidence, has established all of the following:
>
> > (a) the person has intentionally assumed the role and obligations of a parent;
> >
> > (b) the person and the child have formed an emotional bond and created a parent-child type relationship;
> >
> > (c) the person contributed emotionally or financially to the child's well being;
> >
> > (d) assumption of the parental role is not the result of a financially compensated surrogate care arrangement;
> >
> > (e) continuation of the relationship between the person and the child would be in the child's best interests;
> >
> > (f) loss or cessation of the relationship between the person and the child would be detrimental to the child; and
> >
> > (g) the parent:
> >
> > > (i) is absent; or
> > >
> > > (ii) is found by a court to have abused or neglected the child.

*Id.* § 30-5a-103(2). Only the interpretation of subsection (2)(g) is at issue here.

¶ 8 Grandparents assert that subsection (2)(g) can be read in two ways—"the parent" could mean either "the parent whose role and obligations" have been assumed by the person other than a parent or "the parent whose parental presumption is being rebutted." Grandparents' assertion finds some support in the statutory language of section (2) when that section is read in isolation.

¶ 9 The first six factors of section (2), each of which must be demonstrated by clear and convincing evidence, require the court to examine the nature and quality of the relationship between the child and the non-parent. For example, the non-parent must show that he or she has "assumed the role and obligations of a parent," that "the person and the

---

1. Grandparents' briefs also argued that the juvenile court's application of the Act was unconstitutional because it did not take into account Child's "constitutional right of association." The briefs acknowledged that this argument was unpreserved but asserted that an exception, based on ineffective assistance of counsel, applied to the preservation requirement. At oral argument, counsel for Grandparents withdrew both their constitutional challenge and their ineffective assistance of counsel claim.

child have formed an emotional bond and created a parent-child type relationship," and that the loss of the relationship "would be detrimental to the child." One could rationally draw the conclusion, as Grandparents did here, that the legislature intended that Utah law recognize the benefit to the child of preserving the relationship between the child and the person other than a parent where one of the child's parents is absent, neglectful, or abusive. This statutory scheme would recognize that someone had "stepped into the shoes" of the absent or unfit parent and grant visitation or custody rights where the continuation of that relationship was in the child's best interests.

¶ 10 However, any potential ambiguity in the statutory language dissipates when we look to the totality of the statute to guide our interpretation, as *Maestas* instructs. *See State v. Maestas,* 2002 UT 123, ¶ 54, 63 P.3d 621 ("A statute is passed as a whole and not in parts or sections.... Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole." (citation and internal quotation marks omitted)).

¶ 11 The Act explicitly recites the public policy animating the presumption: "In accordance with Section 62A–4a–201, it is the public policy of this state that parents retain the fundamental right and duty to exercise primary control over the care, supervision, upbringing, and education of their children." Utah Code Ann. § 30–5a–103(1). The referenced code section provides that "[u]nder both the United States Constitution and the constitution of this state, a parent possesses a fundamental liberty interest in the care, custody, and management of the parent's children." *Id.* § 62A–4a–201(1)(a) (LexisNexis Supp.2013).[2]

¶ 12 This fundamental liberty interest is protected, in part, by limiting government intrusion into parental decision-making. Grandparents' interpretation of the statute could permit a court to award visitation rights, or even custody, without any examination of the fitness of the parent whose child-rearing decisions are challenged. The first six elements of the statute do not explicitly require any findings of wrongdoing or neglect on the part of the parent whose parental presumption is being rebutted. This leaves subsection (2)(g) as the only element which may protect a fit parent's rights and breathe life into the statement of public policy enshrined in subsection (1) of the Act.

¶ 13 Under Grandparents' interpretation of subsection (2)(g), none of the conditions necessary to rebut a parental presumption would examine the parent whose presumption is being rebutted. The Act would not require a finding of absence, abuse, or neglect on the part of the parent who stands to lose custody. Thus, the Act could result in a fit and present parent losing custody. That interpretation could thereby wrest key parental decision-making away from a parent who has not been adjudged to be absent, abusive, or neglectful and would be wholly incompatible with the statute's stated policy, as well as the long-recognized fundamental liberty interest. *See supra* ¶ 11 note 2; *cf.* Utah Code Ann. § 78A–6–503(9) (LexisNexis Supp.2013) ("The right of a fit, competent parent to raise the parent's child without undue government interference is a fundamental liberty interest that has long been protected by the laws and Constitution of this state and of the United States, and is a fundamental public policy of this state.").

¶ 14 On the other hand, when read as Father advocates, subsection (2)(g) requires the court to determine that the parent

---

**2.** This interest is well entrenched in state and federal jurisprudence. *See Troxel v. Granville,* 530 U.S. 57, 65–66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (stating that "the interest of parents in the care, custody and control of their children ... is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court, and "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children"); *Jensen ex rel. Jensen v. Cunningham,* 2011 UT 17, ¶ 72, 250 P.3d 465 ("In a long line of precedent, [the Utah Supreme Court] has recognized parental rights as a fundamental component of liberty protected by article I, section 7 [of the Utah Constitution].");  *In re M.C.,* 940 P.2d 1229, 1237 (Utah Ct.App.1997) ("[A] fit and competent parent has a constitutional right to parent his or her own children." (emphasis omitted)).

whose parental presumption is being rebutted has been adjudicated as abusive or neglectful or is absent from the child's life. This reading protects "a fit and competent [parent's] constitutional right to parent his or her own children" and harmonizes the public policy recited in subsection (1) with the balance of the Act. *See In re M.C.*, 940 P.2d 1229, 1237 (Utah Ct.App.1997). When read in light of that policy declaration and the other subsections of the Act, the legislative intent inherent in the statutory language—that subsection (2)(g) function as the guardian of the parental rights articulated in subsection (1)—becomes plain. We therefore hold that, when read as part of a harmonious whole, "the parent" in subsection (2)(g) unambiguously refers to the parent whose presumption is being challenged. It follows that the juvenile court did not err in applying subsection (2)(g) of the Act to Father, whose parental decisions Grandparents sought to rebut and whose fundamental liberty interests were at stake.

¶ 15 Grandparents urge us to review the legislative history to find support for their reading of the statutory language. Although we need not resort to the legislative history because the statute is unambiguous, *World Peace Movement of America v. Newspaper Agency Corp.*, 879 P.2d 253, 259 (Utah 1994), a review of the history the parties have provided on appeal does not support Grandparents' interpretation.

¶ 16 Grandparents argue that their reading is consistent with statements Senator Lyle Hillyard, the Act's primary sponsor, made in support of the bill that created the Act. Grandparents quote extensively from a story Senator Hillyard related during a floor debate on the bill. Senator Hillyard recounted his experience with a family in which, after a divorce, the mother left the state and maintained "very very minimal contact" with her children. The father remarried, and his new wife—the children's stepmother—raised the children as her own. After the father died, the biological mother returned to Utah and claimed custody of the children in order to lay claim to the father's workers' compensation and other benefits. Under the then-current laws, the stepmother had no standing to seek custody of the children, even though the children had "really had no contact with" their biological mother. Utah Senate Floor Debates, S.B. 186, 57th Leg., 2008 Gen. Sess. (Feb. 22, 2008) (statements of Sen. Lyle W. Hillyard).

¶ 17 Grandparents assert that "it is hard to believe that at least [Senator Hillyard] did not believe that the [stepmother] would gain custody, or at a minimum visitation, through her newfound standing" under the Act. Grandparents argue that if the Act had existed at the time of those events, subsection (2)(g) would have been satisfied because "the stepmother intentionally assumed the role and obligations of the [absent] biological father."

¶ 18 We do not agree that Senator Hillyard's statements necessarily support Grandparents' reading of the Act. Senator Hillyard's comments may also be read to suggest that section (2)(g) would have been satisfied because the biological mother was deliberately absent from the children's lives. Indeed, the bill's sponsor in the Utah House of Representatives appears to have shared this understanding of the Act. In describing the bill, Representative Kay McIff stated that a court would have to consider the factors described in subsections (a) through (g) "to see if they're strong enough to overcome the rebuttable presumption in favor of the blood parent *who really has had little to no involvement* in the child's [life]." Utah House Floor Debates, S.B. 186, 57th Leg., 2008 Gen. Sess. (Feb. 28, 2008) (emphasis added) (statements of Rep. Kay L. McIff). Even if we were to find the Act ambiguous, the legislative history in the record before us does not suggest a different conclusion than the one we reach.[3]

---

3. Although legislative history can be helpful in resolving questions about the legislature's intent, we also understand the potential pitfalls in attempting to divine the intent of a legislative body from a hand-picked selection of arguably favorable comments. One justice of the Utah Supreme Court has cautioned that a legislature has no collective intent for us to discover, because the passage of every statute is the result of a legislative compromise amongst "those who preferred a stronger bill, ... others who wanted a weaker one (or none at all), and perhaps ... some who had a different goal altogether (through logrolling) or even no sense of the mat-

CONCLUSION

¶ 19 The juvenile court correctly applied the Custody and Visitation for Persons Other than Parents Act. The Act requires a person other than a parent to show, inter alia, that the parent whose decisions are challenged either is absent or has been found by the court to have abused or neglected the child.

¶ 20 Affirmed.

ter at all (due to apathy)." *Gressman v. State,* 2013 UT 63, ¶¶ 69–70, 323 P.3d 998 (Lee, J., dissenting).