**2017 UT App 134**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF C.C., R.T., T.T., AND X.W.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

A.W.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20160448-CA
Filed July 28, 2017

Second District Juvenile Court, Farmington Department
The Honorable J. Mark Andrus
No. 1102119

Aaron C. Garrett and Virginia Ward, Attorneys
for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGE DAVID N. MORTENSEN concurred. JUDGE MICHELE M.
CHRISTIANSEN concurred, with opinion.

VOROS, Judge:

¶1      A.W. (Mother) appeals the juvenile court's termination of
her parental rights to her four children: C.C., an eleven-year-old
male; R.T., an eight-year-old male; T.T., a four-year-old male;
and X.W., a three-year-old male. We affirm.

BACKGROUND

¶2    Mother is a person with a learning disability who also suffers from anxiety, depression, agoraphobia, attention deficit/hyperactivity disorder, and post-traumatic stress disorder. She has a history of illegal substance abuse, particularly methamphetamine. She was involved in two abusive marriages before her marriage to her current husband, L.W. (Husband).

¶3    Mother's involvement with the Division of Child and Family Services (DCFS) that led to termination of her parental rights began in March 2014. Mother lived with Husband, her mother (Grandmother), and her brother (Brother). DCFS investigated a claim of domestic-violence-related child abuse against Husband and found it to be factually supported. Husband had fractured Mother's jaw while she was holding X.W. At the time, X.W. was still an infant. After the incident, Mother and Husband agreed to adhere to a treatment plan that included a domestic violence assessment, domestic violence counseling, and individual counseling. Mother and Husband did enter counseling but did not obtain a domestic violence assessment or domestic violence treatment.

¶4    Three months later, Husband physically restrained C.C. and screamed at Grandmother. A few days later, Husband held R.T.'s face against a wall and yelled an obscenity at the child. Husband then engaged in an altercation with Brother and Grandmother and left the home with X.W. After this incident, Mother gathered the other three children and stayed with Husband at another family member's house.

¶5    In June 2014 DCFS placed the children in protective custody. One of the foster families with whom C.C. and R.T. were placed explained that when the boys arrived they were "really wild." R.T. was developmentally delayed. Both boys had frequent bed-wetting accidents. Nor did they know how to wash their hands, bathe their bodies, or brush their teeth properly. R.T. did not know how to use eating utensils and would "stick

his head down in the bowl" to eat food. He refused to eat anything besides junk food, and C.C. "almost would gorge himself" when he ate and "would take food and put it in his pockets and save it for later."

¶6     In September 2014 the juvenile court ordered that a Child and Family Plan (the service plan) be developed for the children and the parents. In its order, the court stated that Mother "is lower functioning and . . . suffers from severe anxiety, depression, and agoraphobia." The court also ordered that reunification services be provided to Mother and established the primary permanency goal as reunification with Mother with the concurrent goal of adoption.

¶7     The service plan contained the following requirements for Mother: (1) continue to participate in mental health treatment; (2) obtain a domestic violence assessment with Husband and comply with its recommendations for treatment or counseling; (3) avoid further domestic violence, hostile arguments, and other unsafe behavior in her relationship with Husband; (4) avoid criminal behavior; (5) improve her parenting skills through parenting classes, counseling, and eventually peer parenting; (6) avoid illegal substances; (7) provide a stable home for the children and not allow unsafe persons in the home; (8) address the children's various medical and educational needs; and (9) have regular and appropriate visits with the children. The juvenile court accepted the service plan in October 2014; Mother did not object.

*Reunification Services*

¶8     The DCFS caseworker assigned to the case began reunification services in September 2014.[1] The caseworker had

---

1. A different DCFS caseworker was originally assigned to the case but did not testify at trial, nor is it clear from the record what services the original caseworker provided to Mother.

received training on working with persons with disabilities. She was aware that Mother had several special needs and would need personalized care to succeed with the service plan. The caseworker reviewed the service plan with Mother and discussed where Mother could receive the required services. When Mother had questions about a requirement, the two would "talk about it [at] length," discussing "why it was put into place [and] what the steps are to follow through with it." Although the DCFS caseworker did not "normally go out to the parent's home and go quite as in-depth or spend quite as much time with the families," the caseworker "spent numerous hours, several times a month" with Mother. The caseworker noticed that Mother "seemed to lack a lot of skills. For example, . . . her house was very messy, [Mother] did not know how to keep the children entertained and safe while she cleaned up the kitchen or gave one of the children a bath or played with one of them." The caseworker "helped show [Mother] how to clean her house, how to take care of the children while she was cleaning her house, . . . how to . . . make a grocery list, cut coupons, [and] go to the store."

¶9    When the caseworker worked with Mother, she noticed that Mother "would do very well at taking the skills and applying them to the situation" but tended to get side-tracked easily, causing the caseworker to "constantly . . . redirect her back to the skill-building." The caseworker noticed that Mother "did very well hands-on"; as a result, the caseworker modeled different skills, which Mother then repeated on her own. The caseworker prepared charts for Mother to help her manage her time, to budget, and to help care for herself and her children. Mother "did well on those for the most part, but after . . . two or three weeks, she would get side-tracked with something else and then everything [she] worked on was gone."

¶10    In addition to working with the DCFS caseworker, Mother received 41 in-home family therapy sessions starting in December 2014, each lasting one to two hours. The DCFS caseworker arranged the in-home therapy to accommodate

Mother's agoraphobia. Mother disclosed her learning disabilities, agoraphobia, and trauma history to the therapist at intake. Because of her disclosed disabilities, the therapist "slowed things down [and] did a very individualized family approach." The therapist also noted that Mother responded well to hands-on learning and integrated it into the skill-building by demonstrating example behavior for Mother and then observing Mother follow the example. The therapist worked with Mother to create a victim personal safety plan to address the domestic violence issues involving Husband. However, toward the end of reunification efforts, Mother stopped implementing the skills she had acquired in the therapy sessions.

¶11 Mother also completed a domestic violence class. The instructor was aware that Mother had a disability and requested that Mother repeat the class to help reinforce the concepts, which she did. The instructor also met with Mother one-on-one to help her complete homework assignments and ensure that Mother comprehended her reading assignments. After Mother repeated the class, the instructor recommended that Mother take three additional domestic violence courses, but Mother either did not complete the courses or did not provide verification that she had completed them. After Mother expressed discomfort with the group setting of the classroom due to her agoraphobia, the caseworker suggested a domestic violence course that was taught in a one-on-one classroom setting. Mother did not follow through with this referral.

¶12 Mother submitted to a mental health assessment but failed to provide documentation and verification of the assessment to DCFS. Mother maintained that her mental health diagnoses were controlled by medication. Mother attended regular individual therapy sessions throughout the pendency of reunification services.

*Termination*

¶13 In April 2015 Mother let two homeless men stay in her house. Once, Mother arrived with the two men to pick up C.C.

and R.T. for an unsupervised visit. C.C. and R.T.'s foster mother alerted the caseworker about the men. Mother did not tell DCFS about her guests until the caseworker confronted her about it. Mother admitted to the caseworker that she had used one of the guest's e-cigarettes that contained THC oil.

¶14    In May 2015 Husband attempted to follow the domestic violence safety plan by leaving the home during an argument, but Mother blocked him by sitting in the doorway and asked him not to leave. Husband broke the door off of its hinges and bruised Mother's tailbone in the process. Immediately following the door incident, Mother punched herself in the face and hit herself in the stomach with a table. Later that day, the children came for an unsupervised visit. The broken door fell on two-year-old T.T., who began crying. Mother went to the hospital in an ambulance to have her injuries assessed; Husband walked the children to the hospital in a stroller.

¶15    Later that month during another domestic violence incident, Husband threatened to choke Mother. Mother called her stepfather to pick her up. When her stepfather arrived, Husband head-butted him and caused his nose to bleed. Mother called the police, and Husband was arrested. Mother obtained a no-contact order after the incident but voluntarily lifted it several days later.

¶16    In July 2015 a neighbor called the police because they could smell marijuana coming from Mother's home while Mother was home alone. Mother's caseworker visited Mother's home and found marijuana sitting in a cup on the television. The caseworker called the police, and Mother was charged with possession of marijuana.

¶17    At the end of July, the caseworker requested a 90-day extension for reunification services at a permanency hearing. The caseworker felt that due to Mother's "small strides" in progress, if Mother had more time and access to other resources, she might qualify for increased visitation with the children. The juvenile court granted the extension with a "zero-tolerance" compliance

policy. Later that same day, the caseworker received a tip that Mother had been using methamphetamine. Mother admitted to the caseworker that she had used drugs "almost daily" during June and July 2015 and that she had used methamphetamine about ten times recently. After the visit, police arrested Mother on several outstanding warrants. Police found needles containing methamphetamine on Mother's person, and she admitted the needles were for personal use. Mother spent twelve days in jail for possessing methamphetamine.

¶18   In August 2015 DCFS filed a petition to terminate Mother's parental rights. The month before the termination trial, Husband choked Mother and threw her into a wall hard enough to cause damage to the wall and injure her. Mother filed for divorce a few weeks later. She enlisted the help of an abusive ex-husband to move her belongings from the apartment. At the time of the termination trial, Mother admitted to seeing Husband several times since filing for divorce.

¶19   At the termination trial, Mother argued for the first time that DCFS had failed to meet its obligations under the Americans with Disabilities Act. Mother also filed a motion to dismiss on the ground that "she was not provided reasonable reunification services tailored to her individual needs as a person with a disability under federal law." The juvenile court denied her motion and found that the "DCFS caseworker did conduct an assessment of [Mother's] individual needs, . . . she sat down with [Mother] and asked her what her particular needs were, adapted services to those specialized needs, and then repeated this process throughout the case." Additionally, the court noted that "[a]s additional needs of [Mother] were discovered, they were incorporated into the way services were provided." The juvenile court concluded that there were not "any additional services which DCFS could have provided to accommodate [Mother's] disabilities; the treatment plan was tailored to her needs." The juvenile court terminated Mother's parental rights.

ISSUES AND STANDARDS OF REVIEW

¶20 Mother raises three claims of error on appeal. First, she contends that this court should adopt a heightened standard of review in cases involving the termination of parental rights given the fundamental liberty interests at issue.

¶21 Second, Mother contends that "the State's efforts at reunification in this case were insufficient and unreasonable" under the ADA. "[J]uvenile courts have broad discretion in determining whether reasonable reunification efforts were made." *In re K.F.*, 2009 UT 4, ¶ 52, 201 P.3d 985. A determination of whether reasonable modifications under the ADA could be appropriately made is "a mixed determination on a fact-intensive question not meriting a hard look by an appellate court." *In re K.C.*, 2015 UT 92, ¶ 14, 362 P.3d 1248.

¶22 Third, Mother contends that there is insufficient evidence to support an order terminating parental rights. We "review the juvenile court's factual findings based upon the clearly erroneous standard." *In re E.R.*, 2001 UT App 66, ¶ 11, 21 P.3d 680. A finding of fact is only clearly erroneous when it is "against the clear weight of the evidence." *See id.* Therefore, to overturn the juvenile court's decision to terminate a person's parental rights, "the result must be against the clear weight of the evidence or leave the appellate court with a firm and definite conviction that a mistake has been made." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435 (brackets, citation, and internal quotation marks omitted). Further, we give the juvenile court "a wide latitude of discretion as to the judgments arrived at based upon not only the court's opportunity to judge credibility firsthand, but also based on the juvenile court judges' special training, experience and interest in this field." *In re E.R.*, 2001 UT App 66, ¶ 11 (citation and internal quotation marks omitted). Finally, "[w]hen a foundation for the court's decision exists in the evidence, an appellate court may not engage in a reweighing of the evidence." *In re B.R.*, 2007 UT 82, ¶ 12.

ANALYSIS

I. Standard of Review

¶23    Mother contends that we should "apply a heightened standard of review when considering termination of parental rights cases . . . that would give little deference to the findings of the trial court." She argues that "the Utah Constitution should be interpreted to provide a special priority for parental rights."

¶24    This argument is not adequately briefed. An adequately briefed argument must "contain the contentions and reasons of the appellant with respect to the issues presented, including the grounds for reviewing any issue not preserved in the trial court, with citations to the authorities, statutes, and parts of the record relied on." Utah R. App. P. 24(a)(9). Case law applying this rule makes clear that adequate briefing "requires not just bald citation to authority but development of that authority and reasoned analysis based on that authority." *State v. Green*, 2004 UT 76, ¶ 13, 99 P.3d 820 (citation and internal quotation marks omitted). An issue is inadequately briefed "when the overall analysis of the issue is so lacking as to shift the burden of research and argument to the reviewing court." *State v. Thomas*, 961 P.2d 299, 305 (Utah 1998).

¶25    Although Mother argues that this court should adopt a heightened standard of review in parental rights termination cases, she fails to articulate specifically what standard of review we should adopt. She merely suggests the standard should "give little deference to the findings of the trial court" and urges this court to interpret the Utah Constitution to "provide a special priority for parental rights." Although Mother cites cases that establish the fundamental right to parent one's child under the United States and Utah constitutions, she fails to explain how our current standard of review implicates this fundamental right. Mother has not developed the authority she relies on, nor has she provided a reasoned analysis of why we should adopt a heightened standard of review based on that authority. *See Green*, 2004 UT 76, ¶ 13.

¶26 Most importantly, Mother fails to cite a decision in which this court addressed and rejected a materially identical claim. *See generally In re S.Y.T.*, 2011 UT App 407, 267 P.3d 930. In *S.Y.T.*, we rejected an argument that "the current standard of review affording the juvenile court a wide latitude of discretion violates their due process rights because such a standard eliminates any purpose to appeal since there is no meaningful review of the challenge." *Id.* ¶ 34 (internal quotation marks omitted). Generally, this court is bound by its prior decisions. "Horizontal stare decisis . . . requires that a court of appeals follow its own prior decisions." *State v. Menzies*, 889 P.2d 393, 399 n.3 (Utah 1994). Nevertheless, "a panel may overrule its own or another panel's decision where the decision is clearly erroneous or conditions have changed so as to render the prior decision inapplicable." *Id.* (citation and internal quotation marks omitted). Mother has not cited *S.Y.T.*, let alone shown it to be clearly erroneous or no longer applicable due to changed conditions. Accordingly, we reject this claim of error.

## II. Reasonable Accommodations

¶27 Mother next contends that the juvenile court erred in determining that the State's reunification efforts were sufficient and reasonable under the ADA. Specifically, Mother argues that to comply with the ADA, the State "must make an individualized assessment of a person's needs at the outset of the provision of reunification services." Mother also argues that reunification efforts were insufficient because the State failed to take into account the "complex relationship between [her] disabilities and her status as a victim of domestic violence."

¶28 Title II of the ADA prohibits public entities from discriminating against individuals with disabilities. 42 U.S.C. § 12132 (2015). Specifically, section 12132 provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* "[T]he

ADA applies to the provision of reunification services under Utah Code sections 78A-6-312 and 78A-6-507 . . . ." *In re K.C.*, 2015 UT 92, ¶ 1, 362 P.3d 1248.

¶29 The ADA "requires only *reasonable* modifications," and does not establish a "right to extend [a] reunification plan indefinitely." *Id.* ¶ 23. The juvenile court is charged with identifying any modifications to the reunification plan that might be reasonable. *Id.* ¶ 27. In assessing what types of modifications to the plan might be reasonable, the juvenile court is "entitled to take into account the core principles and policies of our Termination of Parental Rights Act—including, of course, 'the paramount concern,' which is the best interests of the child." *Id.* ¶ 23 (quoting Utah Code Ann. § 78A-6-312(19)(c) (LexisNexis 2012)). A parent "may assert a right to reunification services for the first time at the termination hearing," and "she may likewise seek a modification of a reunification plan under the ADA at that stage." *Id.* ¶ 25. However, "[a] parent who waits until the eleventh hour to request a modification under the ADA may thoroughly undermine her ability to establish that such modification is reasonable, particularly once the best interests of the child are taken into account." *Id.* ¶ 27.

¶30 In *K.C.*, a mother with disabilities raised the ADA as an affirmative defense to a termination petition. *Id.* ¶ 9. The mother in *K.C.* made an argument identical to the one Mother makes here—that DCFS "failed to make reasonable efforts to provide sufficient disability-related reunification services." *Id.* (internal quotation marks omitted). Our supreme court noted that "a wide variety of modifications had already been made [for the mother]—such as adoption of various recommendations of mental health professionals, provision of extra peer parenting sessions, and allowing [the mother] extra time to complete tasks." *Id.* ¶ 29. The court affirmed the juvenile court's finding that "there were no additional services DCFS could have provided to accommodate the mother's disabilities." *Id.* ¶¶ 28–29 (brackets and internal quotation marks omitted).

¶31 Here, as in *K.C.*, Mother raised the ADA as an affirmative defense at the termination hearing. *See id.* ¶ 9. And as in *K.C.*, by that time the juvenile court and DCFS had made a wide variety of modifications for Mother. Mother argues that she was entitled to an individualized assessment of her disabilities at the outset of the case and asks us to reverse the juvenile court's determination that reunification services were sufficient. The juvenile court concluded that Mother did not identify "any specific accommodation or modification to the treatment plan which she requested that was denied or not provided by DCFS or by the Court; nor were there any additional services which DCFS could have provided to accommodate [Mother's] disabilities; the treatment plan was tailored to her needs." We agree, "finding ample support in the record for the juvenile court's decision." *See id.* ¶ 29.

¶32 Before it ordered reunification services, the juvenile court was aware that Mother was a person with disabilities. And in its termination order, the juvenile court found that the DCFS caseworker conducted an assessment of Mother's individual needs based on her disabilities. The caseworker was aware of Mother's disabilities and tailored her sessions with Mother to accommodate Mother's needs. For example, although the caseworker did not "normally go out to the parent's home and go quite as in-depth or spend quite as much time," the caseworker spent "numerous hours, several times a month" with Mother. The caseworker referred Mother to a domestic violence course that was taught in a one-on-one classroom setting and arranged for Mother to have an in-home therapist to accommodate her agoraphobia.

¶33 Mother's in-home therapist was aware of Mother's disabilities and tailored her services to accommodate Mother's needs. The instructor of Mother's domestic violence course was also aware of Mother's disabilities and spent time outside of class with Mother to accommodate her needs. Mother attended regular individual therapy sessions to comply with the mental health treatment requirement of her service plan.

¶34 The juvenile court also made accommodations for Mother's disabilities. At the end of July 2015, the juvenile court provided Mother with a 90-day extension for reunification services to provide her with more time to comply with her service plan and the ability to access to other resources. However, that same day Mother was arrested and found with methamphetamine needles on her person, which led the court to terminate reunification services.

¶35 Given the myriad services and modifications provided to Mother throughout the pendency of the case, we "cannot fault the juvenile court for concluding that any further modifications would be unreasonable—particularly given the stage of the proceedings in which the ADA was invoked and the appropriate concern for the best interests of the [children] in question." *See In re K.C.*, 2015 UT 92, ¶ 29.

¶36 Mother also argues that the juvenile court failed to take into account her status as a domestic violence victim and how that status may have influenced her disabilities. However, the DCFS caseworker and the in-home therapist both provided services to Mother tailored to her status as a domestic violence victim, including the creation of a "victim safety plan" to address the ongoing domestic violence in her relationship with Husband, referrals to multiple domestic violence courses, and a referral to a trauma therapy program.

¶37 "In determining 'reasonable efforts' to be made with respect to a minor, and in making 'reasonable efforts,' the minor's health, safety, and welfare shall be the paramount concern." Utah Code Ann. § 78A-6-312(19)(c) (LexisNexis Supp. 2016). Although the juvenile court provided Mother services based on her status as a domestic violence victim, it found that she repeatedly "failed to protect [the] children from being exposed to domestic violence perpetrated by the various men she has brought into the family home," several of whom also physically abused the children. The juvenile court was "entitled to take into account the core principles and policies of our Termination of Parental Rights Act—including . . . the

'paramount concern,' which is the best interests of the child." *See In re K.C.*, 2015 UT 92, ¶ 23 (quoting Utah Code Ann. § 78A-6-312(19)(c) (LexisNexis 2012)). Accordingly, given the juvenile court's "broad discretion in determining whether reasonable reunification efforts were made," we agree with the juvenile court's conclusion that the modifications made to Mother's service plan to accommodate her disabilities and her status as a domestic violence victim were sufficient. *See In re K.C.*, 2015 UT 92, ¶ 14 (citation and internal quotation marks omitted).

### III. Sufficient Evidence

¶38    Finally, Mother contends that the evidence is insufficient to support an order terminating parental rights. Specifically, Mother argues that the juvenile court "failed to give the proper weight to [Mother's] changes in the months preceding trial, instead choosing to focus on the bad acts of [Husband] and using her relationship with him largely as the grounds for terminating her parental rights."

¶39    "[I]f there is sufficient evidence to support any of the grounds for termination found by the juvenile court, the termination of [a parent's] rights is appropriate." *In re K.K.*, 2017 UT App 58, ¶ 3 n.1 (per curiam). The juvenile court "may terminate all parental rights with respect to a parent if the court finds," by clear and convincing evidence, "any one of" the enumerated circumstances contained in Utah Code section 78A-6-507(1). *See* Utah Code Ann. § 78A-6-506(3), -507(1) (LexisNexis 2012). In determining whether a parent is unfit, the court shall consider, inter alia, "habitual or excessive use of intoxicating liquors, controlled substances, or dangerous drugs that render the parent unable to care for the child." *Id.* § 78A-6-508(2)(c) (LexisNexis Supp. 2016). If the court finds the parent "to be unfit or incompetent based upon any of the grounds for termination . . . the court shall then consider the welfare and best interest of the child of paramount importance in determining whether termination of parental rights shall be ordered." *Id.* § 78A-6-506(3) (LexisNexis 2012).

¶40 One of the requirements of Mother's service plan was to refrain from using illegal substances. Relying on Utah Code sections 78A-6-507(1)(c) and -508(2)(c), the juvenile court found that Mother's "habitual or excessive use of controlled substances or dangerous drugs render her unable to properly care for her children." The court explained that Mother's conduct "clearly shows that drugs have interfered with her parenting while being supervised during the pendency of this case, and her choice to begin using methamphetamine heavily for several weeks . . . clearly indicates a need of substance abuse counseling and monitoring of drug use." Because Mother failed to do either, the court reasoned, "her children would continue to be at risk because of her substance abuse problems if they were returned to her."

¶41 We cannot conclude that the juvenile court's findings about Mother's substance abuse were "against the clear weight of the evidence," nor are we left with "a firm and definite conviction that a mistake has been made." *See In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435 (citation and internal quotation marks omitted). Mother acknowledged a history of substance abuse problems. In October 2012 DCFS investigated Mother for fetal exposure to drugs and found the allegation to be factually supported. And at the termination trial, she admitted to using methamphetamine during one of her pregnancies. In May 2015 police responded to a call that Mother was using drugs in the home. In June 2015 Mother refused to submit to a drug test. In July 2015, the DCFS caseworker visited Mother's home and found marijuana sitting in a cup on the television. Mother was later charged with possession of marijuana as a result. Later that month, Mother also admitted to the caseworker that she had used methamphetamine ten times recently. That same day, police arrested Mother and found needles containing methamphetamine on her person. Mother admitted the needles were for personal use; she spent twelve days in jail as a result.

¶42 Mother admitted to "almost daily" methamphetamine use during June and July 2015. Although Mother later claimed that

she lied about her June 2015 drug use because she felt "harassed," she did not submit to random drug testing, did not attempt to receive substance abuse counseling, and provided no verification for her claims that she had been drug-free for the months preceding her termination trial.

¶43    At her termination trial, Mother acknowledged that her drug use had interfered with her ability to parent her children. This was apparent from the state of the older children when they arrived with their foster family. C.C., the eleven-year-old, and R.T., the eight-year-old, had frequent bed-wetting accidents. Nor did they know how to wash their hands, brush their teeth, or bathe their bodies properly. R.T. did not know how to use eating utensils and would "stick his head down in the bowl" to eat food. He refused to eat anything besides junk food, and C.C. "almost would gorge himself" when he ate and "would take food and put it in his pockets and save it for later."

¶44    Ample evidence exists in the record to support the juvenile court's conclusion that Mother's substance abuse rendered her an unfit or incompetent parent. Therefore, the juvenile court's termination of Mother's parental rights was appropriate. *See In re K.K.*, 2017 UT App 58, ¶ 3 n.1.

CONCLUSION

¶45    For the foregoing reasons, the judgment of the juvenile court is affirmed.

————————

CHRISTIANSEN, Judge (concurring):

¶46    A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the due process clauses of both the United States and Utah constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *D.A. v.*

*D.H.*, 2014 UT App 138, ¶ 11 n.2, 329 P.3d 828. But parental rights, although fundamental and constitutionally protected, are not absolute, and the State has a moral and statutory obligation to step in and protect children when those children are suffering from neglect or abuse. Here, given the ample evidence of Mother's continuing substance abuse issues and lack of basic parenting skills, I agree with the majority that the juvenile court correctly determined that Mother was an unfit parent pursuant to Utah Code section 78A-6-507(1)(c)–(d) and section 78A-6-508(2)(c), and that the court properly terminated her parental rights. I therefore concur in the majority opinion.

¶47   However, I write separately to highlight Mother's concern that current law fails to account for the myriad psychological, social, and economic constraints that undermine abused women's efforts to leave their abusers and protect their children from exposure to domestic violence. I remain concerned that a victim of domestic violence who is trapped in a pattern of abuse may not be offered resources adequate to truly break that cycle. *See In re S.B.*, 2003 UT App 303U, paras. 9, 14 (affirming the termination of the mother's parental rights where she had a history of associating with abusive men "to prevent any further abuse [of her children] from the men that [she] chose to bring into the home"); *In re J.B.*, 2001 UT App 33U, para. 2 (per curiam) (affirming the termination of the parents' parental rights "based upon a history of violent behavior by and between the parents" and observing that the mother "was unfit because she had failed to protect [the child] from the effects of domestic violence"); *In re C.B.*, 1999 UT App 293, ¶¶ 8–12, 989 P.2d 76 (affirming the juvenile court's conclusion that the child was neglected because the mother had "voluntarily" returned to an abusive relationship with the child's father).

¶48   Our law should reflect reality. The unfortunate reality is that the choices and options available to victims of domestic violence to enable them to escape the abusive relationships are limited, and may even be non-existent. I do not question that the best interest of the child must be paramount. But I also believe

that the best interest of many children would be served by a system that provides sufficient support to help women break the cycle of abuse, rather than blaming those women for the abuse they have suffered.

————