*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2015 UT 92**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

---

STATE OF UTAH, In the Interest of K.C.,
a Minor Person Under Eighteen Years of Age

---

N.D.,
*Appellant*

*v.*

STATE OF UTAH,
*Appellee.*

---

No. 20140786
Filed Nov. 24, 2015

---

Fourth Juvenile, Spanish Fork
The Honorable F. Richard Smith
No. 1075443

---

Attorneys:

Neil Skousen, Orem, for appellant

Sean D. Reyes, Att'y Gen., John M. Peterson, Carol L.C. Verdoia,
Assit. Att'ys Gen., Salt Lake City, for appellees

Martha Pierce, Salt Lake City, for the
Office of the Guardian ad Litem

---

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court,
in which CHIEF JUSTICE DURRANT, JUSTICE DURHAM, and
JUSTICE HIMONAS joined.

---

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1    This is an appeal from a parental rights termination order entered in the juvenile court. The principal questions presented concern the applicability and operation of Title II of the Americans with Disabilities Act , 42 U.S.C. § 12132, in parental termination proceedings under Utah law. We conclude that the ADA applies to the provision of reunification services under Utah Code sections 78A-6-312 and 78A-6-507, but affirm on the ground that the juvenile court judge did not exceed the bounds of his discretion in deciding that requested modifications to the reunification plan in question were not reasonable.

¶2    K.C. is a minor child born in 2005. She was removed from the custody of her mother, N.D., by order of the juvenile court at a shelter hearing in late October 2012. K.C.'s father was incarcerated at the time.

¶3    The shelter hearing continued six days later. There the State alleged that K.C.'s father had sexually abused her. Based on admissions by the father under Utah Rule of Juvenile Procedure 34(e), the court found that K.C. had been sexually abused. The court also expressed concerns about the mother's mental and physical health and about her ability to protect the child against subsequent abuse. And it adjudged the child "dependent"— "homeless or without proper care through no fault of the child's parent, guardian, or custodian." *See* UTAH CODE § 78A-6-105(11).

¶4    In March 2013, the juvenile court ordered reunification services for the mother. At that time N.D. agreed to the terms of a family service plan prepared by the Department of Child and Family Services. She made no reference to the Americans with Disabilities Act or to any need for the plan to be modified in light of her disabilities.

¶5    The service plan noted, however, that N.D. had extensive disabilities, including serious mental health problems such as schizoaffective disorder, and physical limitations such as poor vision. It also set out seven objectives for N.D. to accomplish in order to be reunited with K.C.

¶6    The court held review hearings on June 3, 2013, and July 31, 2013. At those hearings the court found that DCFS was making "reasonable efforts" toward fulfillment of the service plan. And again N.D. made no reference to the ADA and raised no criticism

of the service plan or any concerns regarding the effect of her disabilities on her capacity to comply with the plan. At the June hearing the State recommended continuation of reunification services. Eventually, however, DCFS decided to oppose continued services, asserting that N.D. was unable to develop a healthy parental relationship with her child.

¶7   A permanency hearing was held on October 15, 2013, at which the State and the Guardian ad Litem asked that reunification services be terminated based on N.D.'s lack of substantial progress. N.D.'s counsel sought a 90-day extension under Utah Code section 78A-6-314(8). But the request was made under Utah law; no reference was made to the ADA (except perhaps implicitly in a vague reference to the need for "reasonable accommodations" for N.D.).

¶8   An evidentiary hearing on permanency began on December 8, 2013. In light of testimony presented at that hearing, the juvenile court concluded that there was insubstantial compliance with the service plan and that extending services was against the child's best interests. Although DCFS had done "more than might be expected to assist the mother" and had "consistently worked to accomplish reunification," the court concluded that N.D. was not likely to become a successful parent without another year or more of intensive therapy, supervision, and support from relatives. Reunification services were therefore terminated—nearly seventeen months after K.C. had originally been removed from N.D.'s custody.

¶9   The State then filed a petition for termination of parental rights, maintaining that the mother had not made sufficient efforts "to support or communicate with the child, to prevent neglect to the child, to eliminate the risk of serious harm to the child, or to avoid being an unfit parent." It was at this stage that N.D. first invoked the ADA—as an affirmative defense to the termination petition. She argued that DCFS had failed to "make reasonable efforts to provide sufficient disability-related reunification services" and had "failed to adequately revise, adjust, and increase disability-related services received during [the] course of this case consistent with the state government agency requirements of the [ADA]." And she contended that the State was therefore precluded from terminating her parental rights, and that she was entitled to additional time for reunification services.

¶10 N.D. claimed that DCFS had not complied with the ADA because it failed to train its caseworkers to provide ADA-compliant services. On that basis, N.D. asserted that the State was incapable of making "reasonable efforts" towards reunification and that termination under such circumstances would run afoul of the ADA. She also complained that she had not been referred to the Coordinating Council for Persons with Disabilities or the Utah Division of Services for People with Disabilities.

¶11 The Guardian ad Litem advanced three arguments against application of the ADA in these circumstances. First, that the ADA does not apply to termination proceedings because they do not constitute "a service, program or activity" under the ADA. Second, that any ADA claims should have been brought prior to the termination proceeding and as a separate action from the child welfare case. And finally, that refusing to terminate parental rights based on ADA violations would cut against the best interests of the child.

¶12 The juvenile court concluded that the ADA is not a defense in a termination proceeding because the proceeding is not "a service, program, or activity." Alternatively, the court concluded that even if the ADA applied, the mother had not suffered harm from any failure to comply with the ADA because the mother's disabilities were accommodated and there was "no evidence of any accommodation that should have been provided but was not." In the court's view, the service plan was properly "tailored to [the mother's] individual needs and limitations and . . . additional adjustment was therefore not needed." Accordingly, the court terminated N.D.'s parental rights under Utah Code section 78A-6-507. N.D. filed a timely appeal.

II

¶13 The threshold question presented concerns the applicability of the Americans with Disabilities Act to the provision of reunification services under Utah Code sections 78A-6-312 and 78A-6-507. That is a question of law, which we review for correctness. *Manzanares v. Byington (In re Adoption of Baby B.)*, 2012 UT 35, ¶ 41, 308 P.3d 382. On this threshold question we disagree with the juvenile court. For reasons set forth below, we conclude that the ADA applies in this context.

¶14 That brings us to a second question—whether the juvenile court erred in its alternative determination that N.D.'s reliance on the ADA fell short on its merits. This was a mixed determination meriting deference on this appeal. *Id.* ¶ 42. The juvenile court's alternative basis for its decision was a determination that there were no reasonable modifications to the reunification plan that could appropriately be made in the circumstances of this case—a mixed determination on a fact-intensive question not meriting a hard look by an appellate court. *See id.*; *A.O. v. State (State ex rel. K.F.)*, 2009 UT 4, ¶ 52, 201 P.3d 985 ("[J]uvenile courts have broad discretion in determining whether reasonable reunification efforts were made."). And we affirm on this ground because we find the juvenile court's decision to be a matter within the bounds of its discretion.

A

¶15 Title II of the Americans with Disabilities Act prohibits public entities from discriminating against disabled individuals. 42 U.S.C. § 12132. Specifically, section 12132 provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.*

¶16 The State conceded that both DCFS and the juvenile court are "public entities" and that N.D. is an "individual[] with a disability."[1] And it is apparent that N.D. alleged that she was denied

---

[1] The State seeks to avoid the sting of this concession by insisting that although N.D. is likely "disabled," she is not a *qualified* individual" because she was "unable to perform the essential functions of a parent." But that reasoning is circular, and an insufficient ground for dismissal at this stage. N.D. qualified for "the receipt of services" when a reunification plan was adopted. And she has asserted that with reasonable modifications she will continue to qualify for reunification services and develop the skills needed to be a qualified parent. If the ADA applies and N.D. is otherwise eligible for its protections, she cannot be deprived of her status as a "qualified individual" based merely on the State's challenge to her qualification as a parent. That challenge is the very matter in dispute.

further reunification services "by reason of" her disability. So the key question concerns the definition of "services, programs, [and] activities."

¶17 In the proceedings below, that question was sometimes focused on the parental termination proceeding itself. But that is not the issue. N.D. was not seeking an accommodation *in court* as part of a termination proceeding—in requesting an interpreter, for example, or some form of assistance in accessing the courtroom. We have no trouble concluding that the ADA would apply in that circumstance, and that a disabled individual would be entitled to complain of discrimination in the provision of the services, programs, or activities available in court. But N.D.'s request was different. She was asking the court to reopen and modify *the plan for reunification services* in order to accommodate her disability.

¶18 That is the question we address. And we have no difficulty resolving it. It is readily apparent that reunification *services* qualify as *services* provided by a public entity. *See* AMERICAN HERITAGE DICTIONARY 1602 (5th ed. 2011) (defining *service* to encompass "[t]he provision to the public of something," and "[o]ffering services to the public in response to need or demand"). A service plan, moreover, appears also to qualify as a *program* or *activity*. *See id*. at 1407 (defining *program* to include "[a] system of services, opportunities, or projects, usually designed to meet a social need"); *id*. at 17 (defining *activity* to encompass "[a]n educational process or procedure intended to stimulate learning through actual experience").

¶19 The terms of section 12132 of the ADA are broad and encompassing.[2] "[S]ervices, programs, [and] activities of a public entity" seem to encompass most all actions of public entities directed to the general public. Clearly these broad terms encompass a plan

---

As we discuss in Part II.B., the question whether N.D. is a "qualified individual" turns on the availability of reasonable modifications. That is a fact-based inquiry that cannot be resolved by the State's bare assertion.

[2] *See Spencer v. Utah State Bar*, 2012 UT 92, ¶¶23–24, 293 P.3d 360 (treating the Utah bar examination as a program under the terms of the ADA).

for reunification services.[3] A few other courts have so held,[4] and we find no room in the statutory text for a contrary conclusion.

¶20 As appellees note, a number of courts have reached the opposite conclusion. In *In re Adoption of Gregory*, , for example, the Massachusetts Supreme Judicial Court held that the ADA may not be raised as a defense in a termination proceeding because "the proper focus of [such] proceedings is the welfare of the child," not

---

[3] *See Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 210 (1998) (holding that a prison ran afoul of ADA by failing to provide a disabled prisoner access to a boot camp program that could have led to his early release; explaining that "[t]he text of the ADA provides no basis for distinguishing" this program from other "programs, services, and activities" covered by the ADA).

[4] *See Family Indep. Agency v. Richards (In re Terry)*, 610 N.W.2d 563, 570 (Mich. Ct. App. 2000) (concluding that "the ADA does require a public agency, such as the Family Independence Agency (FIA), to make reasonable accommodations for those individuals with disabilities so that all persons may receive the benefits of public programs and services"); *Robinson v. State (In re Welfare of A.J.R.)*, 896 P.2d 1298, 1302 (Wash. Ct. App. 1995) ("The Act requires the state or other public entity to make reasonable accommodations to allow the disabled person to receive the services or to participate in the public entity's programs."). It is also worth noting that the Department of Justice has reached the same conclusion. *See* INVESTIGATION OF THE MASSACHUSETTS DEPARTMENT OF CHILDREN AND FAMILIES BY THE UNITED STATES DEPARTMENTS OF JUSTICE AND HEALTH AND HUMAN SERVICES PURSUANT TO THE AMERICANS WITH DISABILITIES ACT AND THE REHABILITATION ACT, U.S. DEP'T OF JUSTICE & U.S. DEP'T OF HEALTH AND HUMAN SERVICES (Jan. 29, 2015), available at http://www.ada.gov/ma_docf_lof.doc (concluding that the Massachusetts DCF had failed to make reasonable modifications required under the ADA and therefore should cease termination proceedings and provide reunification services consistent with the ADA). We cite this letter from the Department of Justice not because it is binding or even authoritative; it is not. It was cited by the parties in this case, however, and we identify it here because we agree with its analysis and ultimate conclusion regarding the applicability of the ADA.

the rights of the parents. 747 N.E.2d 120, 121 (Mass. 2001). We find that unpersuasive. The principal "focus" in termination proceedings may be on child welfare. But at least in Utah there is also a focus on the parent. To the extent the government is providing services aimed at reunification, we have no doubt that the ADA applies.

¶21 For that reason we also reject the notion, embraced by a number of courts, that the ADA may be invoked only as a separate cause of action in an independent proceeding—and not as a defense or other means of altering a service plan by a parent in a termination proceeding.[5] An independent claim for damages would be an inadequate remedy for alleged discrimination in the provision of reunification services for a parent, especially given the fundamental right to parent at stake in such proceedings. The ADA protects a right not to "be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. To make that right a reality, the ADA should be read to guarantee a right to raise this provision while the reunification plan is being implemented—and not just after the fact in a claim for money damages.

B

¶22 To succeed on the merits under the ADA, N.D. would have to establish that she is a "qualified individual with a disability." 42 U.S.C. § 12131(2). And to carry that burden, she would have to show that she is one "who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.*

¶23 Thus, the ADA requires only *reasonable* modifications. And N.D. accordingly had no right to extend the reunification plan indefinitely. She had only a right to modifications deemed reasonable in light of the relevant circumstances. In assessing what sorts of modifications to the plan might be reasonable, moreover, the juvenile court was entitled to take into account the core principles

---

[5] *See In re Antony B.*, 735 A.2d 893, 899 n.9 (Conn. App. Ct. 1999); *Stone v. Daviess Cty. Div. of Children & Family Servs.*, 656 N.E.2d 824, 829–30 (Ind. Ct. App. 1995); *State v. Raymond* (*In re Torrance P.*), 522 N.W.2d 243, 246 (Wis. Ct. App. 1994).

and policies of our Termination of Parental Rights Act—including, of course, "the paramount concern," which is the best interests of the child. UTAH CODE § 78A-6-312 (19)(c).

¶24 The State[6] urges us to repudiate N.D.'s invocation of the ADA on a threshold basis—as time-barred. Citing cases in other jurisdictions, it contends that the ADA may not be invoked by a parent at the eleventh hour of a termination proceeding.[7] Perhaps that conclusion is tenable under the laws of other states. But it does not hold up under Utah law. In a recent opinion we rejected the Guardian ad Litem's insistence that a parent must advance a "request for reasonable reunification services at the hearing when the primary permanency goal is established." *L.D. v. State (State ex rel. A.T.)*, 2015 UT 41, ¶¶ 11–13, 353 P.3d 131. More to the point for present purposes, in *A.T.* we expressly held that a parent "may raise DCFS' failure to provide reasonable reunification services at the termination hearing itself." *Id.* ¶ 12.

¶25 That holding forecloses the State's time bar argument in this case. If a parent may assert a right to reunification services for the first time at the termination hearing, she may likewise seek a modification of a reunification plan under the ADA at that stage.

¶26 In so holding, we do not suggest that the timing of a parent's invocation of the ADA is irrelevant on the merits. Our *A.T.* opinion is again instructive. Although we concluded there that a parent's right to request reunification services is not legally barred at the termination stage, we also noted that a termination proceeding is not "the most prudent and effective time for a parent to request reunification services." *Id.* ¶ 13 n.1. And we explained that the lateness of a parent's request could easily undermine the bid for reunification services on its merits. *Id.* (noting that a failure to request reunification services in a timely fashion "affects our disposition of [the] appeal").

---

[6] On this and other points, the Guardian ad Litem's brief parallels that filed by DCFS. We use the shorthand "State" to encompass both parties.

[7] *See In re Adoption of Gregory*, 747 N.E.2d 120, 124 (Mass. 2001) (holding that a parent "may not raise noncompliance with the ADA or other antidiscrimination laws for the first time at a termination proceeding"); *In re B.S.*, 693 A.2d 716, 722 (Vt. 1997).

¶27 That is likewise the case here. As noted above, the juvenile court is charged here with identifying any modifications to the reunification plan that might be *reasonable*. A parent who waits until the eleventh hour to request a modification under the ADA may thoroughly undermine her ability to establish that such modification is reasonable, particularly once the best interests of the child are taken into account. Children have an interest in permanency and stability. The expeditious resolution of a termination proceeding may well be of paramount importance. So although a parent may not be legally barred from invoking the ADA at the termination stage, such delay may introduce peril on the merits.

¶28 That brings us to the merits of the juvenile court's decision here. The court found that "[t]here were no additional services DCFS could have provided to accommodate [the] mother's disabilities." And it based that conclusion in large part on the fact that the plan had already been "tailored to [the mother's] individual needs, including needs related to the mother's mental illnesses and physical limitations."

¶29 We affirm, finding ample support in the record for the juvenile court's decision. In support of the decision that no further modifications were appropriate, the juvenile court noted that a wide variety of modifications had already been made—such as adoption of various recommendations of mental health professionals, provision of extra peer parenting sessions, and allowing N.D. extra time to complete tasks. We cannot fault the juvenile court for concluding that any further modifications would be unreasonable—particularly given the stage of the proceedings in which the ADA was invoked and the appropriate concern for the best interests of the child in question.

¶30 N.D. has not identified any specific modification that she requested that was denied by the court. She claims only that she should have been granted additional time to complete the objectives of the reunification plan. And the juvenile court reasonably rejected that request. We find ample evidence in the record to support the juvenile court's conclusion that N.D.'s "illnesses present a significant barrier to parenting" and likely "never" will be resolved. N.D. presented expert testimony suggesting that she "may be able to parent [K.C.] after another year or more of intensive therapy." But the juvenile court was not required to accept that testimony or provide more time based on a mere "hypothet-

ical possibility." It had ample grounds for its contrary conclusion that holding out for more time was not a reasonable accommodation. We affirm on that basis.[8]

---

[8] In so doing, we also reject N.D.'s alternative assertion of error in the failure of DCFS to train its employees in the proper administration of the ADA. That is not a viable standalone claim. Either N.D. established a right to a reasonable modification under the ADA or she did not (and here she did not). The availability of training may certainly be useful to N.D. indirectly, but she has no standing to complain about any lack of training as an independent claim.

N.D.'s complaint that she was not referred by DCFS to other state agencies dealing with individuals with disabilities is perhaps unfortunate if true. But it is likewise irrelevant to the question of whether modifications were required to be made to the reunification plan, as we find nothing in the record to suggest that referral to one of these agencies would have made reunification a more likely outcome or necessitated a further modification.