2017 UT App 202

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF B.A.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

M.T.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20160708-CA
Filed November 9, 2017

Third District Juvenile Court, West Jordan Department
The Honorable Renee M. Jimenez
No. 1109173

Harini Venkatesan, Attorney for Appellant

Sean D. Reyes, John M. Peterson, and Emily I.
Iwasaki, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGES JILL M. POHLMAN and DIANA HAGEN concurred.

CHRISTIANSEN, Judge:

¶1     M.T. (Mother) appeals the juvenile court's order
terminating her parental rights to B.A. (Child). She contends
(1) that the juvenile court erroneously ruled that the Americans
with Disabilities Act (the ADA) was inapplicable, (2) that the
evidence was insufficient to support a finding that she was an
unfit parent, (3) that the evidence was insufficient to support a
finding that termination of Mother's parental rights was in
Child's best interests, and (4) that the evidence was insufficient

to support a finding that the Division of Child and Family Services (DCFS) provided reasonable efforts to reunify Mother and Child. We conclude that Mother failed to establish her ADA status in a timely manner and that the evidence presented to the juvenile court was sufficient to support the juvenile court's findings; accordingly, we affirm.

¶2 We recognize that juvenile court judges have special training, experience, and interest in their field, as well as the opportunity to judge credibility firsthand; consequently, we review a juvenile court's decision to terminate parental rights deferentially and will not disturb the juvenile court's findings and conclusions unless the preponderance of the evidence clearly militates against the findings made or the court has otherwise abused its discretion. *In re A.B.*, 2007 UT App 286, ¶ 10, 168 P.3d 820; *In re R.A.J.*, 1999 UT App 329, ¶ 6, 991 P.2d 1118.

## I. Americans with Disabilities Act

¶3 Mother contends that "[t]he juvenile court erred in ruling that [the ADA] was inapplicable due to [Mother's] failure to request an accommodation previously."[1] Although Mother's phrasing suggests that the juvenile court ruled that the ADA was

---

1. Utah Rule of Appellate Procedure 24(a)(5)(A) (2016) requires that an appellant's brief contain "citation to the record showing that the issue was preserved in the trial court." Mother's brief states, "This issue was preserved by Appellant's counsel during termination proceedings." This cursory statement of preservation is insufficient because it merely asserts *that* the issue was preserved and does not show *where* in the record the issue was preserved. Despite this deficiency, we address the merits of the claim, in part because the State provides citations showing that the issue was brought to the juvenile court's attention, albeit not until Mother's closing argument.

inapplicable, the record shows that the court actually ruled that Mother simply had not established her ADA status. We therefore understand Mother's contention as a challenge to the sufficiency of the evidence supporting the juvenile court's finding that Mother had not established her ADA status. Such a challenge presents a mixed question of law and fact, *see In re adoption of Baby B.*, 2012 UT 35, ¶¶ 40–47, 308 P.3d 382, because it involves both the factual question of what evidence had been presented to the court and the legal question of what quantum of evidence would satisfy the ADA disability standard. Accordingly, the court's ruling is a mixed finding that "merit[s] some deference on appeal." *Id.* ¶ 46.

¶4 Mother first mentioned the ADA at the termination trial. The juvenile court found that Mother had not established that she suffered from a medical condition of the type necessitating accommodations under the ADA and that Mother never requested any accommodation:

> [Mother] has not been diagnosed with a medical condition that prohibits her from engaging [in] or attending a drug treatment program, domestic violence treatment program or from obtaining employment. During the entire time of the reunification services time period,[2] [Mother] never claimed she was disabled or referenced the Americans with Disabilities Act. [Mother] never requested a change or an accommodation to the Child and Family Plan to address her medical issues.

---

2. Mother was offered reunification services from at least June 24, 2015, when the child and family services plan was read into the record, to August 16, 2016, when the court terminated Mother's parental rights.

¶5   On appeal, Mother claims that she "had repeatedly put DCFS on notice about her ongoing medical issues" but does not cite to any part of the record in support of this claim. Instead, she relies on her testimony at the termination hearing to the effect that, due to the lapse of her insurance, she had been forced to stop seeing a primary care physician and had been forced to cancel a scheduled surgical procedure. There is no record indication that, prior to the termination hearing, Mother notified DCFS that she had a disability, i.e., that she suffered from "a physical or mental impairment that substantially limits one or more major life activities." *See* 42 U.S.C. § 12102(1)(A) (2012).[3]

---

3. At oral argument before this court, Mother asserted for the first time that, because she informed DCFS of her medical conditions, DCFS or the court had a duty to investigate whether Mother's medical conditions amounted to an ADA-qualifying disability. Mother analogized to a section of the Indian Child Welfare Act (ICWA) which provides that certain ICWA provisions apply "where the court knows *or has reason to know* that an Indian child is involved." 25 U.S.C. § 1912(a) (2012) (emphasis added); *see In re M.J.*, 2011 UT App 398, ¶ 31, 266 P.3d 850 (explaining that a mere hint or suggestion of Indian ancestry is insufficient to trigger ICWA unless it is sufficiently reliable and supports a "low but reasonable probability" that the child qualifies). According to Mother, the ADA should similarly be read to apply its protections whenever the court has "reason to know" that an individual has a disability.

   Mother's assertion suffers from factual and legal infirmities. First, as noted above, in her related claims, Mother did not provide record citations showing how and when she informed DCFS of her alleged medical conditions, let alone ADA-qualifying disabilities. Second, unlike ICWA, the ADA does not contain a "reason to know" provision. In any event, this argument was raised for the first time at oral argument, and this court "will not reverse based on an unbriefed argument raised

(continued…)

¶6 There is no doubt that the ADA applies to the government's provision of reunification services. *See In re K.C.*, 2015 UT 92, ¶ 20, 362 P.3d 1248. And there is no bright-line bar to raising an ADA claim for the first time at the final termination proceeding or trial. *See id.* ¶ 24 (holding that Utah law does not preclude invocation of the ADA "at the eleventh hour of a termination proceeding"). *But see id.* ¶ 27 (noting that a child's interest in permanency and stability favors "[t]he expeditious resolution of a termination proceeding" and, as a result, "[a] parent who waits until the eleventh hour to request a modification under the ADA may thoroughly undermine [his or her] ability to establish that such modification is reasonable").

¶7 However, to succeed on the merits of an ADA claim in the context of reunification, the parent must establish that he or she is a "'qualified individual with a disability.'" *Id.* ¶ 22 (quoting 42 U.S.C. § 12131(2)). Here, Mother first mentioned the ADA on the second day of a two-day trial during her closing arguments. While she claimed that her "condition clearly [was] a disability as defined by the ADA," she did not further identify from what condition she suffers.[4] Nor did she provide the juvenile court with evidence that she had been diagnosed with a medical condition that qualified for ADA accommodations.[5]

---

(…continued)
for the first time at oral argument." *In re Gregory*, 2011 UT App 170, ¶ 10, 257 P.3d 495.

4. On appeal, Mother's briefing repeatedly refers to a medical condition but does not identify it.

5. On the second day of trial, Mother introduced several exhibits. These included records of a doctor examining and diagnosing Mother with a possible ovarian cyst, a condition that does not usually qualify as a disability. Additionally, Mother introduced a summary of her application for disability benefits; that
(continued…)

¶8    Aside from Mother's vague claims of a disability, none of the evidence presented to the juvenile court suggested that Mother's medical conditions amounted to a disability that should have been addressed in the service plan. Consequently, although Mother's eleventh-hour invocation of the ADA was timely, *see In re K.C.*, 2015 UT 92, ¶ 24, it was not supported by any substantial evidence, *see id.* ¶ 22. We conclude that Mother has not shown clear error in the juvenile court's determination that Mother's statement that she suffered from an ADA-qualifying disability was insufficient to satisfy her burden of proof. *See In re adoption of Baby B.*, 2012 UT 35, ¶ 46; *see also In re K.C.*, 2015 UT 92, ¶ 22 (noting that the parent bears the burden of proof to establish an ADA-qualifying disability).[6]

## II. Unfitness

¶9    Mother next contends that the evidence was insufficient to support the juvenile court's determination that she was an unfit parent. The termination of Mother's parental rights was appropriate so long as sufficient evidence existed to support at least one of the unfitness grounds found by the court and to support the court's finding that such termination was in Child's best interests. *See In re R.A.J.*, 1999 UT App 329, ¶ 7, 991 P.2d 1118.

---

(…continued)
application was submitted on July 7, 2016 (roughly a week before trial) and did not identify Mother's claimed disability.

6. We also note that, on appeal, Mother primarily frames this claim as an explanation for her failed urinalysis tests. However, even if Mother had valid prescriptions to justify any positive drug tests, the existence of such prescriptions would not necessarily nullify the juvenile court's finding that "[Mother] has been inconsistent in her drug testing, missing more tests than she has completed."

¶10    Here, the juvenile court found (1) that Mother was an unfit or incompetent parent; (2) that Mother had substantially neglected, willfully refused, or had been unable or unwilling to remedy the circumstances that caused Child to be in an out-of-home placement; (3) that Mother had made only token efforts to support Child, to eliminate the risk of harm to Child, or to avoid being an unfit parent; and (4) that there was a substantial risk that Child would suffer serious detriment if returned to Mother's custody. The court explained that Mother had "failed to comply with the child and family plan and with court orders and as a result, [Mother had] demonstrated a failure of parental adjustment, unfitness and/or neglect and failure to remedy out-of-home placement." The court detailed several grounds for finding Mother unfit, including that Mother was unfit due to "habitual or excessive use of intoxicating liquors, controlled substances, or dangerous drugs that render the parent unable to care for the child." Utah Code Ann. § 78A-6-507(1)(c) (LexisNexis 2012); *id.* § 78A-6-508(2)(c). Because this single ground is sufficient to support the court's decision to terminate Mother's parental rights, we do not further address or express any opinion as to the other grounds found by the court.

¶11    The court highlighted Mother's extensive use of painkilling drugs, finding that Mother did not complete a court-ordered substance abuse evaluation for over 9 months; that Mother had not started, much less successfully completed, a substance abuse treatment program; that Mother had missed more ordered drug tests than she had completed; that Mother had tested positive for various drugs at least 16 times but "has not provided proof of prescription medications to account for all of the positive results"; that Mother visited hospital emergency rooms at least 23 times including nine visits in a single month; that those visits were spread across 5 different hospitals; that Mother ignored recommendations that she follow up these visits by making appointments with non-emergency specialists; that multiple emergency-room physicians reported that Mother left

the hospital after being denied painkilling drugs but before their examinations were complete; and that multiple emergency-room physicians reported their concern regarding Mother's "drug seeking behavior." The court also found that Mother had not candidly reported her emergency room visits to her DCFS caseworker and had not disclosed to the caseworker that she had received controlled substances requiring prescriptions during those visits. The court then summarized these findings:

> [Mother] is either unable or unwilling to participate in a drug treatment program. She has continued to engage in drug seeking behaviors as evidenced by her multiple visits to the emergency room, seeking narcotics and leaving the emergency room when she is not administered IV narcotics or a prescription for pain medication. Furthermore, [Mother] has failed to follow up with the recommended medical care[.]

¶12   On appeal, Mother primarily argues that she is not an unfit parent as a result of habitual or excessive use of controlled substances. She asserts, without citation to the record, that the juvenile court erroneously deemed her missed drug tests to be positive drug tests. Our review of the court's findings does not support this assertion. Rather, the court appears to have considered separately the facts that Mother missed more drug tests than she completed and that, of the tests she did take, sixteen were positive for opiates, one was positive for benzodiazepines, and one was positive for oxycodone. We cannot see how these considerations support Mother's assertion that the court treated her missed tests as positive tests.

¶13   Mother also argues that it was improper for the court to construe medical documents, which she had submitted, as evidence against her interests. Her single sentence argument in this regard is not supported by citation to any authority. Moreover, the interpretation of evidence is within the sole

province of the factfinder. *Cf. State v. Comer*, 2002 UT App 219, ¶ 15, 51 P.3d 55 ("In a bench trial or other proceeding in which the judge serves as fact finder, the court has considerable discretion to assign relative weight to the evidence before it. This discretion includes the right to minimize or even disregard certain evidence before it." (citation and internal quotation marks omitted)). Absent any stricture limiting the use of a particular piece of evidence, we see no impropriety in a factfinder interpreting a piece of evidence to support a different proposition than the one intended by the party who introduced the evidence.

¶14 Finally, Mother argues that she "substantially complied with the Court ordered service plan which was intended to remedy the circumstances that caused the child to be out of her home." Mother claims that she "had housing and employment, previously completed domestic violence and substance abuse treatment, had subsequently completed two further assessments, was engaging in couples counseling with [Child's father] to address the underlying cause of the domestic violence, and was actively engaged in her regular visitation of [Child]." However, Mother does not provide any citation to the record to support these claims, some of which directly contradict the juvenile court's findings. For example, while Mother now claims she completed substance abuse treatment, the court actually found that "[Mother] has not started or successfully completed a substance abuse treatment program."[7]

_____

7. The State suggests that Mother may be referring to mental health treatment she received before Child was removed from her care. However, as the State correctly explains, the mental health treatment did not include a substance abuse treatment program and any treatment predating Child's removal from Mother's care could hardly have remedied the circumstances that led to such removal.

¶15     Mother's conclusory claims in this regard fall short of establishing error in the juvenile court's findings of fact. An appellant bears the burden of proving error in the juvenile court's findings and cannot do so by simply claiming, without citing any record evidence, that the opposite finding should have been made.

¶16     Mother has not demonstrated that the evidence clearly militates against the findings made regarding her drug use and has not shown that the juvenile court otherwise abused its discretion in making them. *See In re A.B.*, 2007 UT App 286, ¶ 10, 168 P.3d 820; *In re R.A.J.*, 1999 UT App 329, ¶ 6, 991 P.2d 1118. Because the court did not abuse its discretion in making those findings, we see no error in the juvenile court's determination that Mother was an unfit parent.[8]

### III. Best Interests

¶17     Mother next contends that the evidence was insufficient for the juvenile court to have properly found that termination of her parental rights was in Child's best interests. *See generally* Utah Code Ann. § 78A-6-509(1) (LexisNexis 2012) (listing factors a juvenile court must consider before terminating a non-custodial parent's rights); *id.* § 78A-6-510 (LexisNexis 2012) (listing factors a juvenile court must consider before terminating parental rights to a child currently placed in a foster home). In determining whether termination of parental rights is in a child's best interests, courts are directed to consider the physical, mental, and emotional condition and needs of the child. *See id.*

---

8. We note that although we only discuss unfitness due to substance abuse, the juvenile court also found that Mother was unfit as a result of her failure to complete mental health treatment, her failure to complete domestic-violence treatment, and her history of violent behavior. *See* Utah Code Ann. § 78A-6-508(2) (LexisNexis 2012).

§ 78A-6-509(1)(a). Although presented as a single issue, Mother's arguments center on three areas: Child's behavioral problems, Child's emotional bonds, and DCFS's alleged provision of services to the foster parents.

¶18    Mother first argues that Child's behavioral problems were the result of being removed from Mother and that "[i]t is highly probable that the behaviors [Child] displayed when [Child] went to the current foster placement could be attributed to the trauma of being removed from [Mother] and coming into DCFS custody." We note Mother presented this argument to the juvenile court, which considered and rejected it. In support of this argument on appeal, Mother points only to the testimony of Child's therapist. However, this testimony was limited to the therapist's opinion that it was possible that Child's mood and isolation was due to the removal. The therapist did not suggest that Child's significant cognitive and developmental deficits could also be attributed to the removal.[9] In the absence of

---

9. When Child was first placed with the foster family, Child "displayed some negative behaviors including swearing, anger, impulsiveness, violence[, and] had a difficult time socializing with other children." For example, Child "would hurt someone else to get what [Child] wanted [and] would hit, kick or spit" to do so. Since being placed with the foster family, Child "made significant progress," "no longer has temper tantrums," and "can now verbalize when [Child] is unhappy or angry." With regard to Child's developmental delays, the juvenile court noted that despite being four and a half years old when placed with the foster family, Child "could not count past the number three," "did not understand the concept of age," and did not know the alphabet. Mother does not challenge the juvenile court's findings that, after his placement with the foster family, Child's behavioral problems had improved significantly and Child was on track in school in all areas except articulation.

evidence suggesting that Child's cognitive and developmental deficits were caused by the removal, we cannot conclude that the balance of the evidence weighed against the juvenile court's finding. Simply making the same argument rejected by the trial court afresh is insufficient to show that the preponderance of the evidence clearly militated against the juvenile court's findings. *See In re A.B.*, 2007 UT App 286, ¶ 10, 168 P.3d 820; *In re R.A.J.*, 1999 UT App 329, ¶ 6, 991 P.2d 1118.

¶19    Turning to Child's emotional needs, Mother describes testimony that Child had emotional bonds with Mother. But as the State notes, a loving relationship between Mother and Child does not necessarily mean termination is not in Child's best interests. *See In re J.F.*, 2013 UT App 288, ¶ 4, 317 P.3d 964. Rather, the existence of such a relationship is one of several factors to be considered by the juvenile court. *See, e.g., id.* ¶¶ 4–5; *In re B.R.*, 2007 UT 82, ¶ 15, 171 P.3d 435. The juvenile court's findings indicate that the court was aware of Child's love for Mother and that it weighed evidence of that bond against other evidence showing Child's love for the foster parents. The court concluded that despite Child loving both Mother and the foster parents, Child's best interests would be served by terminating Mother's parental rights because she had not "sufficiently addressed [her] own needs let alone . . . demonstrate[d] that [she] can make sure [Child's] needs are also met." Thus, the court considered the emotional bond Mother highlights on appeal and determined it was outweighed by other evidence. The preponderance of the evidence does not clearly militate against the court's finding that termination was in Child's best interests, and we will therefore not substitute our judgment for that of the juvenile court. *See In re A.B.*, 2007 UT App 286, ¶ 10; *In re R.A.J.*, 1999 UT App 329, ¶ 6.

¶20    Mother next argues that the foster parents had "financial means and adequate support from DCFS" and that if she had been provided those same services, Child would have thrived with her. In addition to the behavior and emotional issues

discussed above, the juvenile court noted that Child suffered from physical health conditions when he was removed from Mother, including being underweight and having extensive dental problems.[10] The court found that the foster family had successfully addressed these issues. On appeal, Mother asserts that because DCFS did not provide her with the resources for Child's therapy, preschool, and regular pediatric visits before Child's removal, "it is impossible to determine that [Child] would not do well in [Mother's] care" if DCFS had done so. This assertion could be compelling if the situation were as Mother alleged. However, Mother's undeveloped argument in this regard is limited to four sentences and provides no record citations suggesting that DCFS was in fact paying for the services that were provided by the foster family. Moreover, DCFS was charged with acting in Child's best interests to reverse the physical, emotional, and mental health issues Child had developed while in Mother's custody, and it seems logical that the therapeutic regimen involved removing Child from the situation that created the problems.

¶21 The juvenile court made extensive findings regarding Child's best interests before concluding that termination of Mother's parental rights was "strictly necessary." On appeal, Mother's arguments are largely based on conclusory statements that contradict those findings, but which cite neither the record nor authority. Mother has therefore failed to carry her burden of showing that the preponderance of the evidence clearly militated against the court's findings. We therefore have no occasion to substitute our judgment for that of the juvenile court. *See In re A.B.*, 2007 UT App 286, ¶ 10; *In re R.A.J.*, 1999 UT App 329, ¶ 6.

---

10. Child's dental problems included extensive tooth decay, requiring four crowns and "seven or eight" cavity fillings.

## IV. Reasonable Reunification Efforts

¶22 Mother next contends that the evidence was insufficient to support the juvenile court's finding that DCFS "provided reasonable efforts to reunify the family." Specifically, Mother argues that DCFS "imputed to Mother an underlying substance abuse issue rather than accepting at face value all the overwhelming documentation which showed Mother in fact had recurring medical issues." She asserts that the medical issues "prevented her from submitting to each and every [urinalysis] test." Mother also claims that her caseworkers "advised Mother to engage in [urinalysis] testing and in treatment at child and family team meetings, [but] they failed to provide any alternate services despite Mother's repeated requests."

¶23 However, Mother fails to provide any citation to the record evidencing the alleged "overwhelming documentation" of her medical issues. As noted above, *supra* ¶¶ 5, 7, Mother did not provide the court with any evidence of a disability that would require some sort of accommodation to otherwise complete her drug-testing requirements. And nowhere in the record or in the briefing on appeal does Mother identify from which disability she claims to suffer. Instead, she relies on a "Substance Abuse and Mental Health Assessment" which documented her claim that she had been prescribed pain medication. But her statement to a counselor that she had been prescribed pain medication was not supported by a doctor's prescription for such medication.[11] Similarly, Mother does not cite any part of the record to support her claim that she requested alternate services. Moreover, even if Mother had done so and been refused, she has not explained why the services she *was* offered fell below a reasonable standard.

---

11. The assessment also noted that Mother's DCFS caseworker "contradicted most of what [Mother] reported at the time of her assessment."

¶24    Mother also argues that DCFS required her to engage in duplicative services. Specifically, she asserts that she had completed mental health therapy but was required by DCFS to participate in such therapy again. To support this assertion, she points to testimony by her caseworkers that she had completed mental health therapy. This argument is not persuasive. Both caseworkers were describing mental health therapy that Mother participated in *before* Child was removed from her care. Such therapy did not concern, let alone cure, the circumstances that led to Child's removal. Thus, the services were not unnecessarily duplicative. And again, even if they were duplicative, Mother does not explain why the provision of duplicative services undermines the court's finding that the services Mother received were reasonable.

¶25    Affirmed.

_____