2018 UT App 44

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF K.W. AND A.W.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

A.W.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20170229-CA
Filed March 22, 2018

Third District Juvenile Court, Salt Lake Department
The Honorable Mark W. May
No. 1127816

Joshua Fawson, Attorney for Appellant

Sean D. Reyes, John M. Peterson, and Carol L.C.
Verdoia, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGES JILL M. POHLMAN and RYAN M. HARRIS concurred.

CHRISTIANSEN, Judge:

¶1 A.W. (Father) appeals the juvenile court's order terminating his parental rights to his children, K.W. and A.W. Father contends (1) that the Division of Child and Family Services (DCFS) failed to sufficiently modify the reunification-services plan to accommodate his disabilities as required by the Americans with Disabilities Act (the ADA), (2) that the evidence was insufficient to support the juvenile court's finding that termination of his parental rights was in the children's best interests, and (3) that said termination was not "strictly

necessary," as required by Utah Code section 78A-6-507. We conclude that Father's ADA claim fails because Father has not carried his burden of demonstrating clear error in the juvenile court's finding that DCFS provided him reasonable accommodations. We further conclude that Father has not shown that the juvenile court's best-interests finding was clearly erroneous. And we conclude that Father's argument regarding the necessity of termination is inadequately briefed. We therefore affirm the juvenile court's order.

## BACKGROUND

¶2    Father suffered, and continues to suffer from, from bipolar disorder with psychotic tendencies, memory loss from injuries sustained in a car accident,[1] and cognitive impairments from brain surgery to treat a colloidal cyst. Father also had seven drug-related convictions stretching across four states from 1989 to 2012. At the time his parental rights were terminated in March 2017, Father had recently used both marijuana and methamphetamine and was homeless.

¶3    In March 2016, Father contacted law enforcement officers seeking transport to a shelter for himself and his two children, K.W. and A.W. After arriving at the shelter, Father was taken to another facility to receive psychiatric treatment. DCFS was initially unable to locate Father, and the children were placed in the State's custody. In April 2016, the court ordered DCFS to provide Father with reunification services, noting that Father "desires help from DCFS and is willing to participate in services." In May 2016, the court held a disposition hearing. Although it appears from the record that the court and DCFS were aware that Father suffered from disabilities, Father did not reference the ADA at the hearing or ask for specific accommodations other than for help with transportation. The

---

1. The mother of the children died in this accident.

reunification-services plan required Father to undergo a mental health evaluation, comply with the resulting treatment recommendations, undergo drug testing, and meet with Assessment and Referral Services (ARS). The court also ordered modifications to the plan to accommodate Father's needs, including offering Father transportation for any assessments.

¶4 Father did not attend the initial child and family team meeting. And when he did eventually meet his DCFS caseworker to discuss the resulting service plan, it was a "difficult conversation" because he was "so upset just with the fact that the [children] were removed in the first place." After seeing a police car nearby, Father became worried that he would be arrested. Father also became "very emotional concerning the removal of his children" and "could not carry on a conversation."

¶5 The caseworker arranged to pick Father up to take him to a mental health facility for an evaluation. But when they arrived, the facility was unable to see Father that day and instead scheduled a future appointment. The caseworker also scheduled an appointment for Father at ARS for a drug and alcohol assessment. However, Father did not appear at or reschedule either of these appointments.

¶6 Father's contact with DCFS was limited throughout the reunification period. Father was homeless but was often at or near a certain park. When Father had not contacted the caseworker for a while, she would go to the park and look for him to discuss his case. On four or five occasions, the caseworker was able to find Father there and meet with him. But when she tried to speak with him about treatment services, he would become emotional, angry, or paranoid.

¶7 In Father's view, he had not done anything wrong and there was therefore no reason for him to use the services; accordingly, Father refused to participate in them. As a result, Father did not receive the mental health or drug and alcohol

treatment from DCFS required by the service plan. And despite the caseworker's urging, Father refused to visit his previous treatment provider. Father also refused to submit to random drug testing. Eventually, Father stopped cooperating with DCFS at all.

¶8      At first, the caseworker arranged for Father to meet with the children at DCFS's office on a weekly basis. Father would get rides to the office from friends or a relative. According to the caseworker, Father would get angry at those visits, claiming that the children had been kidnapped, and he would attempt to find out from the children where they were living. Father was not consistent in attending these scheduled visits.

¶9      The caseworker then sought to accommodate Father's needs by organizing visits with the children at the park where Father was living. At first, the visits were consistent. But later, Father would often become angry and suggested that he would go to the children's school to take them away. After one visit at the park during which Father was "unhappy and yelling," the caseworker determined that it was no longer safe to have visits there and decided that future visits would be at the DCFS office. However, Father did not attend any more visits or contact DCFS thereafter.

¶10     Transportation was a recurring problem for Father throughout the reunification period. Although the caseworker had initially driven him to appointments, Father's repeated use of "aggressive and angry tones" caused the caseworker's supervisor to advise her not to transport Father for safety reasons. The caseworker then got bus passes for Father, but he refused to use them, claiming that he was unable to bring his bicycle and cart on the bus.[2]

---

2. In its final order, the court noted that Father "is homeless and all of his possessions are contained in a cart that he pulls with his

(continued…)

¶11 Housing was also an issue for Father. Father refused to go to a homeless shelter despite his caseworker's encouragement. According to the caseworker, Father did not want to go to a shelter due to his anxiety about large groups of people. Father knew that suitable housing was necessary for him to regain custody of his children but did not take any action toward that end.

¶12 There were also significant communication barriers between DCFS and Father. For example, Father had no consistent phone number that DCFS could use to contact him. Between January 2017 and the beginning of March 2017, Father used five different phone numbers. And when Father would call DCFS, he would usually refuse to answer questions about his progress in obtaining housing and employment. Instead, he would fixate on what he perceived as DCFS kidnapping his children.

¶13 The juvenile court eventually changed the goal for the children from reunification to adoption. At the termination-of-parental-rights trial, Father appeared and testified. His testimony is discussed below, to the extent that it is relevant to his claims on appeal. After trial, the court ruled that the services had been unsuccessful at addressing the reasons the children had been placed in an out-of-home placement. The court found that several grounds for termination of Father's parental rights had been proven by clear and convincing evidence and consequently terminated Father's parental rights. Father appeals.

---

(…continued)

bicycle." It is unclear what Father had previously done with the bicycle and cart on those occasions that the caseworker drove him to his appointments.

## STANDARD OF REVIEW

¶14   "Whether a parent's rights should be terminated presents a mixed question of law and fact." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435. "We recognize that juvenile court judges have special training, experience, and interest in their field, as well as the opportunity to judge credibility firsthand; consequently, we review a juvenile court's decision to terminate parental rights deferentially and will not disturb the juvenile court's findings and conclusions unless the preponderance of the evidence clearly militates against the findings made or the court has otherwise abused its discretion." *In re B.A.*, 2017 UT App 202, ¶ 2, 407 P.3d 1053.

## ANALYSIS

### I. Americans with Disabilities Act

¶15   Utah law requires DCFS to make reasonable efforts to provide court-ordered reunification services to a parent before the court may terminate that parent's rights to his or her child. Utah Code Ann. § 78A-6-507(3) (LexisNexis 2012). The ADA applies to the provision of such services and requires that "reasonable modifications" be made to a reunification-services plan to accommodate a parent who has a qualifying disability. *See In re K.C.*, 2015 UT 92, ¶¶ 1, 23, 362 P.3d 1248. "Juvenile courts have broad discretion in determining whether reasonable reunification efforts were made. Accordingly, absent a demonstration that the determination was clearly in error, we will not disturb the determination." *In re K.F.*, 2009 UT 4, ¶ 52, 201 P.3d 985 (quotation simplified).[3]

---

3. The court's internal style guide has adopted the parenthetical "quotation simplified" in the spirit of the nascent "cleaned up" parenthetical. *See, e.g.*, *State v. Cady*, 2018 UT App 8, ¶ 9 n.2.

¶16   Here, the ADA was not explicitly mentioned until Father's closing argument at the termination trial. However, it appears that Father's disabilities were known to the parties and the juvenile court—in promulgating the service plan, the juvenile court ordered that certain "modifications to the Service Plan" be made "to accommodate [Father]," including that DCFS offer transportation to any assessments and that all requirements be reflected in writing.

¶17   On appeal, Father contends that DCFS "failed to make reasonable modifications to services as mandated under [the ADA]." In its order terminating Father's parental rights, the juvenile court determined that DCFS had "made reasonable efforts to provide services to [Father]." Therefore, Father now bears the burden of proving that this determination was clearly erroneous. *See In re K.F.*, 2009 UT 4, ¶¶ 44, 52. He identifies several areas in which he believes DCFS failed to make reasonable modifications or efforts, including transportation and communication.

¶18   Father concedes that DCFS made some efforts to provide reunification services to him. On appeal, he identifies additional things that DCFS could have done to help better support his efforts to comply with the court-ordered service plan. But Father does not provide any authority regarding the line between reasonable and unreasonable efforts; i.e., what level of support and services DCFS is required to extend to a disabled parent pursuant to the ADA to aid the parent–child reunification efforts. *Cf. In re P.H.*, 783 P.2d 565, 572 (Utah Ct. App. 1989) ("[R]ehabilitation is a two-way street which requires commitment on the part of the parents, as well as the availability of services from the State." (citation and internal quotation marks omitted)). The fact that DCFS could have made further efforts to help Father resolve the issues that required removal of his children does not necessarily mean that the efforts that *were* made were unreasonable. Moreover, Father's contention is undermined by his lack of cooperation with DCFS and his

failure to notify the court or DCFS that he intended to access the services but needed additional modifications to do so.

¶19    At the disposition hearing held on May 10, 2016, Father's counsel agreed to a service plan that had several modifications to accommodate Father's needs. But Father failed to take advantage of those services and now claims that these modifications, made to assist him in light of his disabilities, were insufficient. During the time that the service plan was in effect, Father never informed the court that he was unable to access the provided services and never asked the court to make additional modifications to enable him to do so. Instead, DCFS and the court were left to guess whether Father's failure to participate in the services was due to an inability to do so or an unwillingness to do so.

¶20    There was certainly good reason for DCFS to believe the latter. The juvenile court noted that, throughout the case, Father did not believe he had done anything wrong and had therefore refused to discuss or participate in the mental-health and substance-abuse treatment programs that were required by the service plan. The court also noted that Father's contact with DCFS was limited. And when DCFS was able to communicate with Father, he would become aggressive, emotional, angry, and/or paranoid. Father did not want to talk about the services he was supposed to engage in; instead, he focused on the removal of the children, his kidnapping claims, and his efforts to discover where they lived and went to school. It appears that, as a result, DCFS was never made aware of Father's claim that the reason for his non-participation in the services was the inadequacy of the modifications to accommodate his disabilities.

¶21    For example, with regard to transportation, Father complains that "no transportation was offered" for his rescheduled mental-health assessment and substance-abuse evaluation. But in actuality, transportation was offered; Father

was given bus passes for this purpose.[4] Father next asserts that he was unable to use the bus system due to his confusion and because the bus drivers would not allow him to take his possessions aboard the buses.[5] But Father does not demonstrate that he ever informed DCFS of his bus-related struggles or that he asked for modifications to the service plan to address those struggles.

¶22 Similarly, Father argues that "DCFS never referred Father to the relevant agencies to receive help to get a phone," which caused communication obstacles. But Father does not assert that

---

4. Father claims that it is disputed whether he was given bus passes until much later in the case, highlighting his own testimony. But the court heard testimony from the caseworker and from Father and nevertheless found that he had been given bus passes. Father does not explain why that finding was clearly erroneous, and we therefore accept it as true.

5. As noted above, Father apparently transported all of his possessions using a bicycle and cart. He claims that the bus drivers would not allow him to take his bicycle and cart on the buses, and therefore that the bus system was not a viable option for him. Even assuming that the ADA's "reasonable modifications" requirement extends beyond the triggering disability to attenuated or unrelated obstacles, such as homelessness, Father's argument in this regard is unavailing. First, Father concedes that he was initially given rides by the caseworker and that he rode the bus to attend the termination trial. And the court found that Father was occasionally given rides by his friends and relatives. There is no record of what Father did with his bicycle and cart on those occasions, and therefore no indication that the solution, whatever it was, would not have worked when Father tried to use the bus system. Second, there is no evidence in the record that Father informed DCFS or the court of the bicycle-and-cart problem, much less that he asked for assistance or an accommodation on that basis.

he ever asked for such help. And Father concedes that he was able to communicate with DCFS on some occasions, using five different phone numbers during the time the service plan was in effect. While it is true that the caseworker testified that the biggest obstacle in the case was that it was "hard to get ahold of [Father]," she was also clear that she was able to do so, at least sometimes. In her view, much of the obstacle was that it was "hard to help him understand anything that was going on with the case." She noted, "Some days, he would just refuse to talk to me; some days, he would refuse to do anything because he would say he didn't do anything wrong; [and] [s]ome days, he would consider it, but there was no follow-through." In other words, although DCFS did not assist Father in getting a phone, Father never asked for such assistance and Father was still able to make and receive phone calls.

¶23　The service plan contained several modifications to accommodate Father's disabilities, and DCFS made significant efforts to assist Father in completing the requirements of the plan. Father has not demonstrated clear error in the juvenile court's finding that the efforts made by DCFS were reasonable. Father cannot carry his burden of persuasion on appeal by simply noting that the efforts made were ultimately unsuccessful and identifying additional steps DCFS could have taken, especially when the record reflects that Father was generally uncooperative and failed to inform DCFS of further modifications he needed to successfully complete the service plan.

## II. Best Interests

¶24　Father also contends that "[t]he evidence was insufficient to support the court's finding that it was in the children's best interest that Father's parental rights be terminated." Specifically, Father argues that the children should have been placed in a "family-supported parenting plan" as an "appropriate accommodation" under the ADA. He notes that his brother and his brother's wife (Uncle and Aunt) had cared for the children

and suggests that DCFS should have considered some sort of plan that allowed him, with the help of Uncle and Aunt, to retain his parental rights.

¶25   Father highlights the successes the children had achieved while being cared for by Uncle and Aunt. But he does not outline the exact contours of a proposed family-supported parenting plan. For example, Father does not explain where the children would live, since Uncle and Aunt have now moved to Oregon while Father remains in Utah. Similarly, while Father acknowledges that placement with Uncle and Aunt would violate a DCFS policy,[6] his response is only to assert—without citation to authority—that the ADA requires DCFS to modify its policies in this circumstance.

¶26   In any event, Father did not present a proposed family-supported parenting plan at any time before the termination trial. This failure undermines his position insofar as it relies on the ADA. *See In re K.C.*, 2015 UT 92, ¶¶ 20, 27, 362 P.3d 1248 (explaining that there is no bright-line bar to raising an ADA claim for the first time at a termination trial but noting that "[a] parent who waits until the eleventh hour to request a modification under the ADA may thoroughly undermine [his or her] ability to establish that such modification is reasonable" given that a child's interest in permanency and stability favors "[t]he expeditious resolution of a termination proceeding"). And Father did not present such a plan at the termination trial.

¶27   Father also suggests that termination is not in the children's best interests because "[t]erminating Father's parental rights [will] terminate contact between the children and Father, severing what has been a very important relationship in the

_____

6. DCFS has a policy preventing placement of a child with individuals who have been convicted of manslaughter or certain other crimes. Uncle's criminal record shows a manslaughter conviction from approximately thirty years ago.

children's lives." But the foster parents, who wanted to adopt the children, testified that they would facilitate visits between Father and the children: "We're not trying to exclude anybody . . . . [W]e understand they have family, even besides their dad [and] we're not ever going to try to take that away from them . . . [a]s long as it's good for them and it's what they want."

¶28 Given the grounds for termination presented to the court and the evidence presented that Father was unable to rectify the circumstances that led to his children originally being removed from his custody, Father has not demonstrated that the juvenile court's finding that termination of his parental rights was in the children's best interests was clearly erroneous.

### III. "Strictly Necessary"

¶29 Father's final contention, limited to four sentences, is that terminating his parental rights was not "strictly necessary." *See* Utah Code Ann. § 78A-6-507(1) (LexisNexis 2012). He asserts that the juvenile court's finding that terminating his parental rights was strictly necessary was erroneous because Uncle and Aunt could have been granted permanent custody and guardianship of the children.

¶30 This argument is inadequately briefed and therefore fails to carry Father's burden of persuasion. As noted above, DCFS's policy precluded placement with Uncle, and Father has not established that the ADA required modification of that policy. Moreover, the juvenile court expressed concern that Uncle and Aunt, if granted guardianship, would not allow the children to continue living with the foster parents.[7] Father's brief contention in this regard does not address either of these concerns.

---

7. We note the children's expressed desires to continue living with the foster parents and be adopted by them, but we ascribe no legal significance to those desires on appeal.

Consequently, Father has not carried his burden of persuasion to show error in the court's conclusion that termination was strictly necessary.

¶31 While we are sympathetic to Father's plight, we are unable to see any abuse of discretion in the juvenile's court's decision to terminate Father's parental rights. Because Father was not able to remedy the problems that led to K.W.'s and A.W.'s removal from his custody and did not demonstrate that the services offered to him were insufficient, the juvenile court appropriately focused on finding permanency and stability for these two young children.

¶32 Affirmed.

_____