**2023 UT App 14**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF K.K., S.K., AND S.K.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

B.K.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20220051-CA
Filed February 9, 2023

Second District Juvenile Court, Farmington Department
The Honorable Sharon S. Sipes
No. 1176751

Scott L. Wiggins, Attorney for Appellant

Sean D. Reyes, John M. Peterson, and Candace
Roach, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGE GREGORY K. ORME concurred. JUDGE RYAN M.
HARRIS concurred, with opinion.

CHRISTIANSEN FORSTER, Judge:

¶1     This is a companion case to and arises out of the same facts
involved in *In re K.K.*, 2023 UT App 13, which also issues today.
In short,[1] B.K. (Mother) and D.K. (Father) are the parents of

---

1. A more fulsome description of the relevant facts and procedural
history can be found in *In re K.K.*, 2023 UT App 13, the case in

(continued…)

triplets K.K., S.K., and S.K. (collectively, the Children). When the Children were six years old, the State filed a petition for custody and guardianship on the grounds that the Children were neglected and abused by Mother and Father. The underlying facts giving rise to the petition were multiple acts of domestic violence, culminating in a physical and boisterous verbal altercation between the couple that occurred on June 22, 2021, and that took place in front of the Children and other witnesses.

¶2     Following an adjudication trial on the petition, during which the juvenile court heard testimony from Mother, Father, two neighbors who had witnessed the June 22 altercation, and two police officers who had responded to the neighbors' 911 calls regarding the June 22 altercation, the court issued an order adjudicating the Children neglected and abused as to Mother.

¶3     In the adjudication order, the court found, among other things, that Mother and Father had engaged in numerous acts of domestic violence, some of which had occurred in the presence of the Children, including on June 22; that when Mother and Father fight they sometimes send the Children downstairs to wait with a roommate, which had occurred two or three times that year; that the Children are aware they are sent downstairs because Mother and Father fight; that "[a]ccording to the [C]hildren, [Father] and [Mother] fight and yell and hurt each other's bodies"; and that "[t]he [C]hildren have experienced domestic violence with enough frequency that they appear calm during incidents between their parents . . . even though the parents 'fight a lot and hurt' each other."

¶4     As to Mother, the court found she was not yelling back at Father during the June 22 altercation but that she did yell at him on another occasion during which officers were dispatched to the

which we adjudicated Father's appeal. In this case, we adjudicate Mother's appeal.

house on a "domestic" call. In addition, the court found that Mother "is not concerned" that the Children witness her and Father fight and that her "demeanor and testimony"—including her inability to recall much of what happened on June 22—"is in tune with her desire to protect [Father] rather than address the domestic violence that exists in her home." Based on these findings, the court concluded that Mother "has failed to protect the [C]hildren from exposure to domestic violence in the home" and that "[Father] and [Mother's] domestic violence in their home has harmed the[] [C]hildren."

## ISSUES AND STANDARDS OF REVIEW

¶5      Mother now appeals the juvenile court's neglect and abuse adjudications, asserting the court erred in determining that she neglected and abused the Children. We review the juvenile court's factual findings deferentially, reversing the court's findings only if they are clearly erroneous. *In re E.R.*, 2021 UT 36, ¶ 15, 496 P.3d 58. A finding is clearly erroneous when the court either "failed to consider all of the facts or reached a decision against the clear weight of the evidence." *Id.* ¶ 32 (quotation simplified). And we review the juvenile court's underlying legal determinations nondeferentially for correctness. *See In re A.B.*, 2022 UT 39, ¶¶ 27–28.

## ANALYSIS

¶6      Mother argues the juvenile court erred in determining that the State had proved by clear and convincing evidence that she neglected and abused the Children "by exposing them to domestic violence." Clear and convincing evidence is an "intermediate standard of proof" that "implies something more than the usual requirement of a preponderance . . . of the evidence; and something less than proof beyond a reasonable doubt." *Essential Botanical Farms, LC v. Kay*, 2011 UT 71, ¶¶ 21, 24, 270 P.3d

430 (quotation simplified). "For a matter to be clear and convincing to a particular mind it must at least have reached the point where there remains no serious or substantial doubt as to the correctness of the conclusion." *In re S.Y.T.*, 2011 UT App 407, ¶ 42, 267 P.3d 930 (quotation simplified).

¶7    Because neglect and abuse are distinct, with different statutory definitions, we address Mother's challenge to the juvenile court's adjudications separately. With regard to Mother's neglect adjudication, we conclude the court did not err in determining that she neglected the Children. As to the court's abuse adjudication, we conclude that Mother, like Father, cannot show prejudice resulting from the abuse adjudication where the underlying facts giving rise to both adjudications are the same. Accordingly, we decline to address the merits of Mother's challenge to the abuse adjudication.

## I. Neglect

¶8    To prove that Mother neglected the Children, the State needed to present clear and convincing evidence that Mother's "action[s] or inaction[s]" caused the Children to experience a "lack of proper parental care . . . by reason of the fault or habits of" Mother or that Mother "fail[ed] or refus[ed] . . . to provide proper . . . care necessary for [the Children's] health, safety, morals, or well-being." *See* Utah Code § 80-1-102(58)(a)(ii)–(iii). Mother argues the juvenile court's conclusion that she neglected the Children by "'allowing' them to be exposed to her abuse at Father's hands" does not satisfy the statutory definition of neglect. She further contends that the court "engaged in unwarranted assumptions that are contrary to the well-settled notions underlying the Battered Woman Syndrome" by concluding that Mother's "behavior constituted 'nonaccidental' conduct or that her behavior was due to her 'faults or habits.'" We disagree.

¶9 The evidence presented at trial included testimony from six witnesses who detailed Father and Mother's history of engaging in domestic disputes with each other and specifically described the altercation that occurred on June 22. The testimony indicated that two of the children were present during the June 22 altercation and were observed "clinging" to Mother outside in the front yard while Father argued with her, punched her, and threw objects at her. One of the officers who responded to the June 22 altercation testified that the two children who had witnessed the altercation "seemed calm" and were not "distraught or flustered at all."[2] The officers acknowledged they had been called to Mother and Father's house prior to the June 22 altercation on a "domestic" call after neighbors reported Mother and Father were screaming at each other.

¶10 Mother also testified that on many occasions she tried to prevent the Children from observing her and Father fight. To accomplish this, "as soon as any argument started" she would send the Children downstairs with her roommate, where they would wait until the fight was over. Despite making this effort, Mother testified that she believed the Children were aware they were sent downstairs to avoid hearing any fighting. Moreover, the evidence also showed that Mother repeatedly allowed Father to return home after the court issued a criminal no contact/protective order and that she minimized the severity of the domestic violence. Mother was also largely unwilling to testify at trial about the June 22 altercation, claiming that she had "trouble remembering" much of what happened. Based on this evidence, the juvenile court found, "[Mother] is not concerned that the [C]hildren are subjected to the argument[s] between [Mother] and

---

2. The juvenile court did not take this evidence to mean that the Children had not been adversely affected by their parents' inappropriate behavior. Rather, the inference drawn by the court was that the parental conflict had been so pervasive that the Children had become somewhat numb to it.

[Father]. [Mother's] demeanor and testimony is in tune with her desire to protect [Father] rather than address the domestic violence that exists in her home."

¶11 As described above, in its adjudication order, the juvenile court made several findings in support of its determination of neglect as to Mother. Those findings address Mother's ongoing relationship with Father and the violent dynamic of their relationship, Mother's knowledge that the Children were aware of her fights with Father despite her attempts to shield them from the violence, and Mother's apparent lack of concern or desire to extricate herself from future interactions with Father. Under Utah law, a parent "ha[s] a statutory duty not to knowingly place [their] child in harm's way." *In re C.B.*, 1999 UT App 293, ¶ 9, 989 P.2d 76. By voluntarily returning to the abusive relationship with Father, Mother ignored this duty by "potentially subjecting the [Children] to witness, or be the victim of, further abuse." *See id.* Moreover, as discussed in *In re C.C.W.*, 2019 UT App 34, 440 P.3d 749, a parent's act of domestic violence can have adverse impacts on a child, even if there is no evidence of violence toward the child and even if the child does not directly witness the violence. Relying on "both common sense and expert opinion," this court recognized that children who are exposed to domestic violence may suffer "direct physical and psychological injuries," regardless of whether they are physically harmed. *Id.* ¶¶ 20–21 (quotation simplified). Among other things, children who observe domestic violence "may be taught that violence is an acceptable way to handle issues with loved ones," which "breeds a culture of violence in future generations. . . . Abused children are at great risk of becoming abusive parents." *Id.* ¶ 20 (quotation simplified). Although it is unfortunate that Mother is a victim of domestic violence, her decision to knowingly return to Father and to protect him rather than to protect the Children despite her knowledge that the Children are aware of the abuse in the home satisfies the statutory definition of neglect.

¶12    We recognize that most, if not all, of the domestic violence at issue in this case was committed by Father against Mother and that Mother was therefore often the victim rather than the perpetrator. But under Utah's statutory definition of neglect, under certain circumstances, even victims of domestic violence can "neglect" their children if they fail to take sufficient steps to protect them from the domestic violence present in the home or if they choose to prioritize their relationship with the perpetrator of the violence over the need to protect their children. After all, neglect can stem from either "action or inaction" on the part of a parent, *see* Utah Code § 80-1-102(58)(a), as long as the "inaction" in question causes either "lack of proper parental care of a child by reason of the fault or habits of the parent" or "failure or refusal of a parent . . . to provide . . . care necessary for the child's health, safety, morals, or well-being," *see id.* § 80-1-102(58)(a)(ii)–(iii). Here, the juvenile court found that Mother was "not concerned" about protecting the Children from domestic violence and that Mother had a "desire to protect [Father] rather than address the domestic violence that exists in her home." These findings were supported by substantial evidence presented at trial. And these facts, as found by the court, constitute "neglect" as our legislature has defined that term. In short, Mother's "inaction" in failing to protect the Children from exposure to domestic violence and prioritizing her toxic relationship with Father resulted in a failure to provide the "care necessary for [the Children's] health, safety, morals, or well-being" and caused the Children to experience a "lack of proper parental care." *See id.*

¶13    Mother resists this conclusion by contending the juvenile court improperly relied on *In re C.C.W.* for "the proposition that children are harmed by domestic violence in the home." She asserts the court's reliance on *In re C.C.W.* was unwarranted because that case concerned a proceeding to terminate parental rights whereas this case concerns abuse and neglect adjudications. While Mother is correct that the two proceedings are different, those differences do not bear on whether the court could properly

rely on the research and studies cited in *In re C.C.W.* supporting the general proposition that domestic violence is harmful to children. *See* 2019 UT App 34, ¶ 20. Termination proceedings and abuse and neglect adjudications are both governed by the Utah Juvenile Code, *see* Utah Code § 80-4-301 (termination of parental rights); *id.* § 80-3-201 (abuse or neglect proceedings), and the statutory definitions of "neglect," "abuse," "harm," and "threatened harm" are the same in both proceedings, *see id.* § 80-1-102(1), (37), (58)(a), (92) (providing definitions applicable to provisions of Title 80, Utah Juvenile Code). Accordingly, it does not follow that the court may properly consider the effect of domestic violence in finding neglect in one proceeding but not the other.

¶14 In addition, Mother asserts that the juvenile court "rel[ied] on the unfounded presumption that Mother's decision to maintain a relationship with Father constituted a conscious failure to protect the Children from exposure to domestic violence." In so doing, Mother posits that the juvenile court ignored the directive offered in *In re C.C.W.* cautioning courts "to avoid unnecessarily drawing negative inferences from a battered spouse's decision to maintain a relationship with the batterer, or from a battered spouse's decision to decline to immediately seek help." *See* 2019 UT App 34, ¶ 19 n.4. But that is not what happened here.

¶15 In this case, the juvenile court analyzed the evidence before it in adjudicating Mother for neglect. Thus, the court's conclusion was not based on an unfounded presumption. As previously discussed, the evidence the court considered included testimony that Father had engaged in multiple acts of domestic violence in the presence of the Children. And based on Father's multi-year track record of assaulting Mother, even after services were provided to him, the court could reasonably conclude that Father is likely to continue perpetrating acts of domestic violence against Mother in the future and that the Children will continue to be exposed to the violence if Mother fails to take action. In short, the

court's determination that Mother failed to provide the proper care for the Children's health, safety, morals, or well-being by failing to protect them and prioritizing her relationship with Father was based on the evidence presented at trial and not on an unwarranted presumption.

¶16　Finally, Mother misconstrues the directive offered in *In re C.C.W.* cautioning courts to "avoid unnecessarily drawing negative inferences from a battered spouse's decision to maintain a relationship with the batterer." *See id.* Mother contends that by adjudicating her for neglect, the juvenile court made an "automatic determination that both the batterer and victim are responsible as a unit," which in turn results in the victim being blamed for the domestic violence. While we are sympathetic to Mother and acknowledge that extricating oneself from an abusive relationship can often prove difficult, *see In re L.M.*, 2019 UT App 174, ¶ 9, 453 P.3d 651 (per curiam); *In re C.C.*, 2017 UT App 134, ¶¶ 46–48, 402 P.3d 17 (Christiansen, J., concurring), we cannot say that a parent's status as a domestic violence victim excuses the parent's duty to protect the children or provides the parent with license to elevate the relationship with the abuser over the safety of the children. Indeed, the directive offered in *In re C.C.W.* merely cautions courts to "avoid unnecessarily drawing negative inferences" about a victim's decision to stay in an abusive relationship. 2019 UT App 34, ¶ 19 n.4. It does not prevent the court from considering domestic violence issues in their entirety, nor does it provide absolution for a parent who continues to expose a child to domestic violence. To find otherwise would be contrary to precedent. *See, e.g., In re L.M.*, 2019 UT App 174, ¶ 8 ("A parent who maintains a relationship with an abusive partner jeopardizes a child's safety."); *In re T.M.*, 2006 UT App 435, ¶ 20, 147 P.3d 529 (collecting cases and observing that "Utah case law indicates that courts have minimal empathy for parents whose strong emotional ties to their spouses or significant others jeopardize their children's safety").

¶17    Accordingly, we affirm the court's neglect adjudication.

## II. Abuse

¶18    The juvenile court determined that Mother both neglected and abused the Children by failing to protect them from exposure to domestic violence and that Father and Mother's "domestic violence in their home has harmed the[] [C]hildren." Mother argues the court's abuse adjudication was in error because the State failed to produce clear and convincing evidence of abuse as it is statutorily defined. *See* Utah Code § 80-1-102(1)(a)(i)(A)–(B), (37)(a)–(b) (defining abuse as including "nonaccidental harm of a child" and "threatened harm of a child" and defining harm as "physical or developmental injury or damage" and "emotional damage that results in a serious impairment in the child's growth, development, behavior, or psychological functioning"). Mother raises a fair point that other than applying the general principles set forth in *In re C.C.W.* to infer harm, the State did not present specific evidence that the Children had sustained harm, and the court made no specific findings—other than that the Children appeared calm during incidents of domestic violence between their parents—that the Children were developmentally harmed or suffered the sort of emotional damage that constituted serious impairment to their growth, development, behavior, or psychological functioning.[3]

¶19    But even if we were to agree with Mother that the juvenile court erred in adjudicating the Children as abused as to Mother,

---

3. We do not intend to suggest the State could never demonstrate that a parent who is the victim of domestic violence has "abused" his or her children, as that term is statutorily defined. We agree with the general sentiments expressed in the concurring opinion that such a path is possible but is more difficult than demonstrating "neglect" and would require specific evidence and findings. *See infra* ¶¶ 22–27.

Mother cannot show she was prejudiced by any such error. *See In re N.M.*, 2018 UT App 141, ¶ 27, 427 P.3d 1239 ("An error is prejudicial only if a review of the record persuades the appellate court that without the error there was a reasonable likelihood of a more favorable result for the appellant." (quotation simplified)); *In re. J.B.*, 2002 UT App 268, ¶¶ 8–12, 53 P.3d 968 (affirming the termination of a father's parental rights despite the juvenile court's reliance on improper findings because such reliance did not result in "prejudicial error"). Mother claims that being labeled an abuser "negatively affect[s] her ability—going forward—to perform the primary caretaking responsibilities to [the] Children." But Mother does not demonstrate how the court's abuse adjudication will affect her more severely or more negatively as this case proceeds than the neglect adjudication will. *See In re G.B.*, 2022 UT App 98, ¶ 34, 516 P.3d 781 (declining to reach the merits of a challenge to an abuse adjudication where the parent did not challenge a neglect adjudication based on the same facts because the parent did not demonstrate that the abuse adjudication carried "some collateral consequences . . . that [did] not follow from a neglect determination"). Indeed, post-adjudication dispositions turn on the factual circumstances that bring a family into court rather than on the category of adjudication and are implemented based on concern for the child's health and safety and remedying the underlying issues resulting in the adjudication. *See* Utah Code § 80-3-405. Here, as found by the juvenile court, whether her inaction is labeled as abuse or neglect, Mother failed to protect the Children from exposure to domestic violence and prioritized her relationship with Father over the well-being of the Children. The services that will be offered to Mother and the Children to remedy these circumstances are not likely to differ based on whether the adjudication is for neglect or abuse. We agree with the guardian ad litem's assertion that "any or all three categories of adjudication (abuse, neglect, dependency) trigger the same dispositional provisions." Accordingly, because Mother has not demonstrated how the court's abuse adjudication will affect her

any differently than the neglect adjudication, she cannot show prejudice.[4] *See In re K.K.*, 2023 UT App 13, ¶ 28 (concluding, based on the same facts as the current case, that Father could not show prejudice stemming from the court's abuse adjudication because the abuse adjudication was based on the same underlying facts supporting the neglect adjudication).

CONCLUSION

¶20 We are cognizant that Mother is a victim of domestic violence, not a perpetrator. Nevertheless, the primary purpose of the State's petition alleging neglect was to protect the Children, not to punish Mother. Based on the foregoing, we conclude the evidence presented by the State was sufficient to support the juvenile court's neglect adjudication as to Mother. And even if the juvenile court erred in its abuse adjudication, Mother has not persuaded us that she was prejudiced by any such error because she has not shown how she will be negatively affected by the abuse adjudication over and above the effect of her neglect adjudication. Accordingly, we affirm.

————————

HARRIS, Judge (concurring):

¶21 I concur fully in the majority opinion. I write separately to offer a word of caution to juvenile courts when it comes to finding that a parent who is a victim of domestic violence has "abused" or "neglected" his or her children by allowing them to be exposed

_____

4. In fact, a review of the underlying docket in Mother's case reveals that Mother and the Children have done so well in their treatment and services that the juvenile court released the Children from DCFS's protective supervision and terminated the court's jurisdiction last fall.

to domestic violence in the home. In my view, Utah's statutory definitions of the terms "abuse" and "neglect" are broad enough to make it possible, in certain situations, for courts to determine that a domestic violence victim has committed abuse or neglect. But courts should exercise caution in doing so, and should make these rather striking findings only in appropriate cases.

¶22 With regard to neglect, we hold today that the juvenile court's determination was appropriate in this case, because Mother's "inaction" in failing to protect the Children from the domestic violence occurring in the home constituted a lack of proper parental care, as well as a failure to provide care necessary for the Children's health, safety, or well-being. *See supra* ¶¶ 8–16; *see also* Utah Code Ann. § 80-1-102(58)(a)(ii)–(iii) (LexisNexis Supp. 2022). In my view, the key to affirming this determination, in this case, was the court's finding that Mother had prioritized her relationship with her abuser over the safety and well-being of the Children. Evidence presented at trial indicated that Mother repeatedly allowed Father to return to the home despite the existence of protective orders making it unlawful for him to be there, and that she was less than fully cooperative with DCFS and law enforcement officials who were investigating the situation. This sort of evidence, to my way of thinking, is critical to any determination that a domestic violence victim has neglected his or her children. Absent evidence like this, domestic violence victims will likely not have committed actions or inactions significant enough to constitute "neglect" of their children.

¶23 And given the differing statutory definitions, it is even more difficult for domestic violence victims to be considered to have "abused" their children than it is for them to be considered to have "neglected" their children. The statutory definition of "abuse" is (justifiably) narrower than the statutory definition of "neglect." In order to find that abuse has occurred, a court in most cases (that is, in cases not involving sexual exploitation, sexual abuse, human trafficking, or the child's death) must find either (a)

"nonaccidental harm of a child" or (b) "threatened harm of a child." *See id.* § 80-1-102(1)(a)(i)(A), (B); *see also In re K.T.*, 2017 UT 44, ¶ 9, 424 P.3d 91 ("To find abuse under Utah law, a court must find harm.").

¶24    A finding that a child has sustained nonaccidental harm involves a backward-looking determination, one that must be supported by evidence that the child has already been harmed. And the kind of harm at issue—according to strict statutory definition—must be either "physical or developmental injury or damage" or the sort of "emotional damage that results in a serious impairment in the child's growth, development, behavior, or psychological functioning." *See id.* § 80-1-102(37)(a), (b). I can envision a court, in many cases, being able to make a finding of physical harm without the necessity of expert testimony, but in my view a finding of already-sustained "developmental injury or damage" or emotional damage severe enough to cause "a serious impairment in the child's growth, development, behavior, or psychological functioning" will often require expert testimony. I think this will nearly always be the case where the question presented is whether a child has already sustained non-physical "harm" as a result of a victim parent failing to protect the child from violence in the home.

¶25    A finding that a child has sustained "threatened harm" is— by contrast—more of a forward-looking inquiry, under the applicable statutory definition. As our legislature has defined it in this context, "threatened harm means actions, inactions, or credible verbal threats, indicating that the child is at an unreasonable *risk* of harm or neglect." *See* Utah Code Ann. § 80-1-102(92) (emphasis added). A child can sustain "threatened harm" even if the child has not yet sustained actual "harm." Pursuant to statutory definition, a child sustains "threatened harm" when, through the "actions" or "inactions" of a parent, the child is placed at "unreasonable risk" of future "developmental injury or damage" or "emotional damage" severe enough to seriously

impair the "child's growth, development, behavior, or psychological functioning." *See id.* § 80-1-102(37)(a)–(b), 102(92). In cases involving parents who are victims of domestic violence, a juvenile court could perhaps more easily make a finding of "threatened harm" than already-sustained past harm. Indeed, we have already recognized that "domestic violence can have adverse impacts on a child, even if that child is not the direct object of such violence, and even if the child does not directly witness the violence." *See In re C.C.W.*, 2019 UT App 34, ¶ 20, 440 P.3d 749. A parent victim's failure to adequately protect a child from violence in the home could—if the violence was frequent and severe enough, and likely to continue in the future—lead to a supported finding that the parent, through inaction, has placed the child at an unreasonable risk of future developmental damage. It may even be possible, in appropriate cases, for such a finding to be made without expert testimony.

¶26 But in order to reach "abuse" through "threatened harm" in cases involving victims of domestic violence, a court must make specific and supported findings regarding each of the elements of the statutory definition. First, a court must specify that it is finding "abuse" by way of "threatened harm" (as opposed to through a finding of already-sustained "nonaccidental harm"). Second, the court must make a detailed finding of threatened harm on the facts of the case at hand, including specific identification of the "action or inaction" taken by the parent that leads to the "unreasonable risk" of future harm, as well as a satisfactory explanation of why the risk of future harm is "unreasonable." Third, the court must specify the type of future harm it believes the child is at risk of sustaining, whether it be developmental injury or severe emotional damage, and should explain—with reference to specific evidence in the record—why the court believes the child is likely to sustain that particular type of harm.

¶27 In short, Utah's statutory definitions of "neglect" and "abuse" are broad enough to allow courts, in appropriate cases,

to find that a parent who is the victim of domestic violence has committed neglect or abuse by failing to protect his or her child from domestic violence in the home. But courts should exercise caution in so doing, and should reserve such findings for those cases in which the domestic violence is severe and sustained and in which the victim parent has taken specific actions or inactions aimed at prioritizing his or her relationship with the abuser over care and protection of the children.

¶28     In this case, I concur in the majority's view that the court made appropriate findings of neglect with regard to Mother. I also concur in the majority's decision not to reach the merits of the propriety of the court's findings regarding abuse as to Mother, but I register serious reservations about the adequacy and sufficiency of those findings, and urge courts to exercise caution in making neglect and abuse determinations in situations like this one.

———————