2023 UT App 13

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF K.K., S.K., AND S.K.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

D.K.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20220050-CA
Filed February 9, 2023

Second District Juvenile Court, Farmington Department
The Honorable Sharon S. Sipes
No. 1176751

Freyja Johnson, Emily Adams, and Hannah K.
Leavitt-Howell, Attorneys for Appellant

Sean D. Reyes, John M. Peterson, and Candace
Roach, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES GREGORY K. ORME and RYAN M. HARRIS
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     D.K. (Father) and B.K. (Mother) are the parents of triplets
K.K., S.K., and S.K. (collectively, the Children). When the
Children were six years old, the State filed a child welfare petition
for custody and guardianship on the grounds that the Children
were neglected and abused by Father and Mother. Following an

adjudication hearing on the petition, the juvenile court issued an order adjudicating the Children as neglected and abused.

¶2    Father now appeals the juvenile court's abuse adjudication, arguing that the State failed to prove by clear and convincing evidence that he abused the Children. We affirm.

BACKGROUND

¶3    In 2019, when the Children were four years old, the State filed a petition seeking protective supervision services based on allegations that Father and Mother had engaged in repeated acts of domestic violence in front of the Children. Thereafter, Father and Mother agreed to engage in services voluntarily, and the State eventually dismissed its petition.

¶4    Two years later, however, Father and Mother again engaged in a series of domestic violence incidents that involved law enforcement. In May 2021, Father called the police and told them that Mother had "beat him up." When officers arrived on scene and talked to Father, he told them he and Mother were "fighting about money" and that Mother "swung to hit him but never touched him." On June 10, officers were again dispatched to the family home on a "domestic" call because Father and Mother were "screaming at each other with the [C]hildren in the home." When officers arrived, they could hear the screaming. Father was uncooperative with the officers, but he eventually left the home. However, Father returned to the home later that same night.

¶5    On June 22, Father and Mother were involved in an altercation that led the State to seek custody and guardianship of the Children. During this altercation, Father and Mother were arguing inside the home. Mother was sitting on the couch, and Father sat on top of her demanding that she give him the keys to the car. Father then "head butted" Mother and told her to get out

of the home, which she did. Once Mother was outside, Father followed her and began punching her "with a closed fist on the side of her stomach." Father proceeded to grab a large rock and chase Mother around the car, "acting like he was going to throw the rock at her." The Children were outside of the home for the duration of the altercation and witnessed Father chasing Mother and hitting her. Several neighbors also witnessed the altercation and called the police. When officers arrived, Father was arrested and taken to jail.

¶6    After Father's arrest, Mother completed a lethality assessment, an evaluation given to assess the level of danger an abused person faces, which resulted in a score of high risk. Mother did not seek a protective order for herself or for the Children during the eight days Father was in jail. However, due to the severity of the prior altercation, the district court entered a criminal no contact/protective order on July 1. The order prohibited Father from residing with Mother and the Children.

¶7    On July 8, a caseworker from the Department of Child and Family Services (DCFS) went to the home for an unannounced visit. During the visit, the caseworker found Father outside; Father reported that Mother was inside sleeping. Father allowed the caseworker to interview the Children. During the interview, the Children reported that Father and Mother "fight and yell" and "hurt each other's bodies." Father was subsequently arrested for violation of the criminal no contact/protective order. Thereafter, the caseworker attempted to talk to Mother, who had been inside sleeping, but Mother refused to speak with the caseworker.

¶8    Based on the foregoing, the State filed a petition for custody and guardianship of the Children on the grounds that they were neglected and abused based on Father and Mother engaging in domestic violence in the home. Following a shelter hearing, the juvenile court determined the Children should remain in Mother's custody for the time being but ordered Mother

and the Children to have "absolutely no contact" with Father and that Mother "immediately notify law enforcement" if Father appeared at the home.

¶9     Following a series of pretrial hearings, the matter proceeded to an adjudication trial in December 2021. At trial, the State presented the testimony of six witnesses: Mother, Father, two neighbors who had witnessed the June 22 altercation, and two police officers who had responded to the neighbors' 911 calls regarding the June 22 altercation.

¶10     According to the neighbors, Father and Mother were arguing about car keys. As Father approached Mother, "she put her arms out to stop him . . . and he slapped her hands aside." Father then began punching Mother "haymaker style" to her side and stomach. The punching continued "for a minute or two," and Father connected "five to ten" times. After the punching stopped, Father chased Mother around the front yard, "throwing rocks" and "bikes and other toys" in the direction of Mother, although the neighbors did not see any of the objects hit Mother.

¶11     The neighbors testified that during the altercation, two of the Children were in the front yard "standing behind [Mother]" and "clinging" to her. Mother was positioned between Father and the two children, acting as a "buffer" between them. One neighbor opined that he did not "believe any [of Father's] aggression was towards the children," and that "at no[] point did [he] think [the two children] were in any sort of danger." However, the two children were outside the entire time, "seeing everything."

¶12     In addition, one neighbor testified that she had witnessed Father and Mother "screaming" at each other multiple times in the presence of the Children prior to the June 22 altercation. Moreover, the neighbor had witnessed Father yelling at the Children twice and had observed that the Children "are terrified and trying to do whatever [Father] says to not be in trouble."

¶13 The responding officers testified next. One officer testified that after arriving at the scene on June 22, he interviewed Mother, who told him that she had been arguing with Father over car keys. During the argument, Father "sat down on her" to keep her from leaving, headbutted her in the forehead, and "punched her in the back of the leg." After Mother jumped out the window to the front yard, Father followed her and the two continued arguing. Father chased Mother around a vehicle parked in the front yard; once he caught her, he began "punching her in the side underneath her arms with a closed fist." Mother was able to break away, but Father chased her with a rock in his hands. Mother told the officer the Children were outside with her during the altercation.

¶14 The officer also interviewed Father about the altercation. Father said he was "upset" because Mother hid the car keys from him but that "nothing got physical." Father told the officer he and Mother had argued and run around the vehicle in the front yard. Father indicated that he had picked up a rock and held it over his head, but he did not throw it, nor did he intend to.

¶15 Lastly, the officer testified regarding his observations of the Children. When the officer arrived at the scene, the Children were inside the house. The officer interviewed Mother while she was standing at the front door. During the interview, the officer saw "at least two" of the Children standing by the front door behind Mother and "one of the kids popped his head outside" and asked for stickers. Officer opined that the Children's demeanor "seemed calm." The Children seemed "a little upset that some toys were . . . strewn about the front yard," but otherwise they did not seem "distraught or flustered" by the altercation.

¶16 Mother testified that the June 22 incident started when she refused to give Father the keys to the car. Mother explained that she could not remember all the details about the altercation because she has "trouble remembering things." However, she did remember that the altercation began when Father headbutted her

in the house. After the headbutt, Father and Mother went outside to the front yard. Although Mother did not remember whether Father hit her in the yard, she recalled that he "didn't follow [her] around the yard," that he picked up a basket and "threw it up in the air" but not "at" her, and that he "picked up a rock" but did not chase her while holding it. Mother maintained that the Children had not observed the altercation because they were downstairs inside the house with a roommate where they stayed until the officers arrived.

¶17    Mother also testified that the Children "were never present for full on arguments or yelling." She explained that "as soon as any argument started," her roommate would take the Children downstairs so they would not be able to hear the fighting. Although Mother did not believe the Children had been impacted by the fighting, she did believe the Children were aware that they were sent downstairs to avoid hearing any fighting.

¶18    Father testified last. When asked about the June 22 altercation he invoked his Fifth Amendment right not to testify because criminal charges were pending against him regarding that incident. But Father explained that "before" he and Mother would engage in any verbal arguments, the Children would go downstairs.

¶19    After considering all the evidence, the juvenile court issued an adjudication order. In the order the court found, among other things, that Father and Mother had engaged in numerous acts of domestic violence, some of which had occurred in the presence of the Children, including the one on June 22; that when Father and Mother fight they sometimes send the Children downstairs to wait with a roommate, which had occurred two or three times that year; that the Children are aware that they are sent downstairs because Father and Mother fight; that "[a]ccording to the [C]hildren, [Father] and [Mother] fight and yell and hurt each other's bodies"; and that "[t]he [C]hildren have experienced

domestic violence with enough frequency that they appear calm during incidents between their parents . . . even though the parents 'fight a lot and hurt' each other."

¶20   As to Father, the court drew a number of adverse inferences based on his decision to invoke his constitutional right to silence when asked specific questions about the June 22 altercation. And as to Mother, the court found that she "is not concerned" about the Children witnessing her and Father fighting and that her "demeanor and testimony"—including her inability to recall much of what happened on June 22—"is in tune with her desire to protect [Father] rather than address the domestic violence that exists in her home." Based on these findings, the court concluded that Father "failed to provide proper care necessary for the health, safety, morals and well-being of the children in that he has engaged in domestic violence with [Mother], and [both Father and Mother] failed to protect the [C]hildren from exposure to domestic violence in the home." The court also concluded that "[Father] and [Mother's] domestic violence in their home has harmed [the Children]" and, accordingly, adjudicated the Children as neglected and abused as to Father.

ISSUE AND STANDARD OF REVIEW

¶21   Father now appeals only the juvenile court's abuse adjudication, arguing that the court's ruling was in error because the State failed to prove by clear and convincing evidence that he had harmed or threatened harm to the Children. "We apply differing standards of review to findings of fact, conclusions of law, and determinations of mixed questions of law and fact." *In re E.R.*, 2021 UT 36, ¶ 14, 496 P.3d 58. We review the juvenile court's factual findings deferentially, reversing the court's findings only if they are clearly erroneous. *Id.* ¶ 15. A finding is clearly erroneous when the court either "failed to consider all of the facts or reached a decision against the clear weight of the evidence." *Id.*

¶ 32 (quotation simplified). However, the question of whether the juvenile court properly applied the governing law to the facts of the case presents "a law-like mixed question subject to nondeferential review." *In re A.B.*, 2022 UT 39, ¶ 27.

ANALYSIS

¶22    At an adjudication trial, the juvenile court must determine whether "the allegations contained in the abuse, neglect, or dependency petition are true" by "clear and convincing evidence." Utah Code § 80-3-402(1). Clear and convincing evidence is an "intermediate standard of proof" that "implies something more than the usual requirement of a preponderance . . . of the evidence; and something less than proof beyond a reasonable doubt." *Essential Botanical Farms, LC v. Kay*, 2011 UT 71, ¶¶ 21, 24, 270 P.3d 430 (quotation simplified). Put differently, this standard requires "the existence of facts that make a conclusion very highly probable." *Id.* ¶ 24 (quotation simplified).

¶23    As relevant here, "abuse" is defined as the "nonaccidental harm of a child" or the "threatened harm of a child." Utah Code § 80-1-102(1)(a)(i)(A), (B). Thus, "[t]o find abuse under Utah law, a court must find harm." *In re K.T.*, 2017 UT 44, ¶ 9, 424 P.3d 91. "Harm" includes "physical or developmental injury or damage" and "emotional damage that results in a serious impairment in the child's growth, development, behavior, or psychological functioning." Utah Code § 80-1-102(37)(a), (b). And "[t]hreatened harm" is defined as "actions, inactions, or credible verbal threats, indicating that the child is at an unreasonable risk of harm or neglect." *Id.* § 80-1-102(92).

¶24    As applied to this case, to satisfy the clear and convincing standard, the State "needed to present evidence that would allow the [juvenile] court to conclude that it was very highly probable that the [C]hildren had been harmed." *See In re K.T.*, 2017 UT 44, ¶ 9 n.3 (quotation simplified). In reaching this conclusion the

court may properly "infer harm" based on the evidence presented. *Id.* ¶ 14. However, the court may not "speculate" about the existence of harm absent clear and convincing evidence demonstrating the actions actually resulted in harm. *Id.* ¶¶ 14–17.

¶25 After considering the evidence presented during the adjudication trial, the juvenile court concluded the Children were abused because "[Father] and [Mother's] domestic violence in their home has harmed [the Children]." Father argues the court's conclusion was in error because the State failed to produce clear and convincing evidence that he physically harmed the Children or that the Children were developmentally harmed or emotionally damaged by observing Father assault Mother and Father and Mother argue. But even if we were to agree with Father that the State failed to present sufficient evidence that Father harmed the Children and were to agree that the juvenile court erred in adjudicating Father as abusing the Children, Father has not demonstrated that he was prejudiced by the alleged error. *See In re N.M.*, 2018 UT App 141, ¶ 27, 427 P.3d 1239 ("An error is prejudicial only if a review of the record persuades the appellate court that without the error there was a reasonable likelihood of a more favorable result for the appellant." (quotation simplified)); *In re. J.B.*, 2002 UT App 268, ¶¶ 8–12, 53 P.3d 968 (affirming the termination of a father's parental rights despite the juvenile court's reliance on improper findings because such reliance did not result in "prejudicial error"). As noted above, the court adjudicated the Children as both neglected and abused, and Father appeals only the court's abuse adjudication. Although Father is correct that "[a]buse and neglect are statutorily defined and given 'distinct statuses'" and that "[u]nder the statutory definitions . . . abuse requires a higher level of improper conduct from a parent than neglect," that distinction has no bearing in this case—and Father has not shown that it is likely to have any bearing in the future—because the court's adjudications of neglect and abuse were based on the same underlying incidents of domestic violence.

¶26 When a juvenile court adjudicates a child as either neglected or abused, that determination brings the child within the jurisdiction of the court and allows the court to enter dispositional orders. *See* Utah Code § 80-3-402. The dispositions available to the court do not hinge on whether the child was adjudicated as neglected or abused. Instead, dispositions are tied to the factual findings about what is going on in the case and are implemented based on concern for the child's health and safety and remedying the underlying issues resulting in the adjudication. *See id.* § 80-3-405.

¶27 Here, the juvenile court's disposition is governed by the need to address Father's commission of domestic violence in the presence of the Children and the risk such behavior will continue. Services to address this behavior will not differ whether the underlying adjudication is labeled as neglect or abuse because the court's neglect determination was based on the same underlying facts as the abuse determination: here, Father's failure to protect and to provide proper care for the Children as a result of his engaging in acts of domestic violence.[1]

---

1. In his reply brief Father argues he was harmed by the juvenile court's abuse adjudication because "an abuse adjudication goes into a central abuse registry system managed by DCFS" and "the information in that registry is used for licensing purposes and prevents individuals who have been adjudicated of abuse from holding licenses in certain professions." But this argument misses the mark. While Father correctly notes that the abuse registry system—called the Management Information System (the MIS)—can be accessed by the State for all future cases involving Father, *see* Utah Code § 80-2-1001, he conflates the MIS with a "sub-part" of the MIS called the Licensing Information System (the LIS), *see id.* § 80-2-1002(1)(a)(i). Information on the MIS includes facts relevant to each child welfare case, whereas the LIS is maintained

(continued…)

¶28 Father cites this court's decision in *In re C.M.R.*, 2020 UT App 114, 473 P.3d 184, for the proposition that Father was harmed by the court's abuse adjudication, asserting that the findings of abuse in the adjudication order "will form the basis for whether [Father] is able to comply with the requirements of [any service plan] going forward and whether [Father] can be reunited with the Children." *See id.* ¶ 28. But unlike the mother in *In re C.M.R.*, who was potentially prejudiced by entering admissions to allegations regarding a specific additional incident of abuse at the adjudication hearing, Father's abuse adjudication was based on the exact same underlying set of facts as his neglect adjudication. In this case, Father has not challenged the juvenile court's neglect adjudication, nor has he challenged the court's underlying factual findings—which support both the neglect and the abuse adjudications—that he assaulted Mother in the presence of the Children and repeatedly engaged in heated verbal arguments with her. Those underlying actions, which form the foundation for both adjudications, are the reason why he "can only have supervised visitation with [the] Children" and why "[h]e is not allowed in the home," and not because the court adjudicated the Children as abused in addition to neglected. Because Father has not challenged the neglect adjudication or demonstrated how the ramifications flowing from this unchallenged adjudication would

---

for "licensing purposes." *See id.* § 80-2-1002(1)(a)(i). Although an individual on the LIS may be prohibited from, among other things, holding licenses in certain professions, *see id.* § 80-2-708(2)(a)(v), inclusion on the LIS is not automatic in every child welfare case. Rather, the LIS identifies only individuals found to have committed a "severe type of child abuse or neglect." *See id.* § 80-2-708(1). Because the court did not adjudicate Father as severely abusing the Children, inclusion on the LIS does not automatically follow, and Father has not asserted that he has been—or is likely to be—included therein. Accordingly, Father has not demonstrated that, in this case, he has sustained any prejudice as a result of the juvenile court's abuse determination.

be less severe than those resulting from an abuse adjudication, he has not demonstrated that he has sustained any prejudice as a result of the court's abuse adjudication.[2] *See In re G.B.*, 2022 UT App 98, ¶ 34, 516 P.3d 781 (declining to reach the merits of a challenge to an abuse adjudication where the parent did not challenge a neglect adjudication based on the same facts because the parent did not demonstrate that the abuse adjudication carried "some collateral consequences . . . that [did] not follow from a neglect determination").

## CONCLUSION

¶29 On appeal, Father does not challenge the juvenile court's findings that he committed domestic violence in the presence of the Children or that those actions resulted in him neglecting the Children by failing to provide them proper care and to protect them from exposure to domestic violence. Under these circumstances, even if the juvenile court erred in its separate abuse adjudication—a conclusion we stop short of reaching— Father has not demonstrated he was prejudiced by any such error because he has not challenged the court's neglect adjudication or the facts underlying it, which are the same facts underlying the court's abuse adjudication, and any court-ordered disposition will be based upon Father's own acts and not the adjudication of abuse.

¶30 Affirmed.

---

2. Indeed, in the juvenile court's dispositional order, entered approximately two months after the adjudication order, Father's primary responsibility is to "complete a domestic violence/mental health assessment . . . and follow any and all of the recommendations made."